Susan Cooper **HOUBEN**, Plaintiff,

v.

**TELULAR CORPORATION**, Defendant.

No. 97 C 1489.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 10, 1999.

Philip J. McGuire, Luce, Forward, Hamilton & Scripps, LLP, Chicago, IL, Thea M. Pazen, Chicago, IL, for Susan Cooper Houben, plaintiff.

Marvin N. Benn, Dawn Marie Cassie, George W. Hamman, Jeanne Marie Hoffmann, Hamman & Benn, Chicago, IL, for Telular Corporation, defendant.

*MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Susan Cooper Houben filed a thirteen-count complaint against Telular Corporation, her former employer, presenting claims under both state and federal law based on her discharge. Although Telular sought summary judgment on all of Houben's claims, we instructed Houben to respond only to Telular's attack on her federal claims; namely, her claims brought under Title VII for sex discrimination, 42 U.S.C. § 2000e *et seq.;* the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* For the reasons set forth below, we deny Telular's motion for summary judgment with regard to Houben's Title VII and Pregnancy Discrimination Act claims, but grant Telular's motion as to the Family and Medical Leave Act claim.

## FACTS

In accordance with the summary judgment standards, we relate the record facts in the light most favorable to Houben and make all reasonable inferences in her favor. *Janiuk v. TCG/Trump Co.,* 157 F.3d 504, 505 (7th Cir.1998). We note significant factual disputes, but omit all factual information not pertinent to Houben's federal claims. Houben has wisely abandoned her FMLA claim, thus we also exclude facts relevant only to that claim.

In 1994, Telular hired Houben as Director of Corporate Development. On June 1, 1995, Telular promoted Houben to a new position titled Account Director—Motorola.[1] Dan Wagster was her immediate supervisor. As the Motorola Account Director, Houben supervised a three-person sales team—including Kevin Geary, Houben's eventual replacement. Houben was also responsible for the "planning and management of Telular's relations with Motorola, including sales, service, support and training; supervision of all of the Motorola Account Team's duties and direct responsibility for sales in the Middle East and Africa."[2] (Houben Mem.Att. 1, Houben Aff. at ¶ 13.)

In January 1995, Houben's team began efforts to enlarge Telular's relationship with Motorola by supplying a Motorola project in Hungary with equipment and services. Eventually these efforts paid off: in October 1995, Telular was "awarded a contract to supply a specially customized PHONESELL SX product to Motorola's Cellular Infrastructure Group for deployment in existing and future wireless local loop projects in Hungary," (12N Statement, Doc. 000 Series at 000005, Telular Press Release of Oct. 5, 1995, at 1); and in November, Telular announced that, in connection with the Hungary project, Motorola made "a $100 million purchase commitment over three years," (12N Statement, Doc. HOU Series at HOU 0689, Telular Press Release of Nov. 16, 1995, at 1). Telular's pleadings describe the Motorola account—particularly the Hungary project—as critical to Telular's financial well-being.

During that same time period, Autumn 1995, Telular executives began discussing the possibility of restructuring the organization. Although Telular's sales doubled in 1995, its losses were reduced by only one-third and stock prices were "75% off [their] highest price." (Telular's 12M Statement, Ex. 5, Transcript of the 1995 Annual Shareholders Meeting at 3 (Statement of William DeNicolo).) On December 18, 1995, the executives first presented a reorganization proposal to Telular's Board of Directors. (Telular's 12M, Ex. 4, Minutes of the Dec. 18, 1995 Bd. Mtg.) The Board reserved judgment on the plan, and instructed the executives "to prepare and present meaningful budget estimates consistent with the proposed Plan." (*Id.* at 3.) Of course, rumors of a pending reduction-in-force circulated among Telular's employees

---

1. The record suggests, although neither party explicitly states, that Houben was promoted to the Account Director position during her first maternity leave. (*See* Houben Mem. at 6 (stating Houben was on maternity leave between May and July 1995 after the birth of her first child).)

2. The pleadings do not disclose the precise nature of the relationship between Telular and Motorola. We believe that Telular designed and produced equipment that enabled Motorola products to communicate with, and therefore be used in conjunction with, existing telecommunications infrastructure of foreign countries.

during December 1995. But, when Houben asked Wagster about the rumors, he allegedly told her that the Motorola team would be unaffected by the possible RIF. (Houben Mem.Att. 1, Houben Aff. at ¶ 13.)

On January 4, 1996, Houben informed her superior, Dan Wagster, that she was pregnant with her second child. In response to the news, Wagster congratulated Houben but said that Bill DeNicolo, Telular's CEO, was not happy with the timing: Houben expected to be on maternity leave at the end of Telular's fiscal year, an apparently busy time.

On January 12, Telular's Board of Directors met again, and reviewed the preliminary budget projections under the proposed restructuring. The record does not reveal the Board's response at that time, but later that month, on January 23, the Board ratified the plan. (Houben's 12N Statement, Docs. T Series at T0379, Letter from Dan Wagster to Motorola Team File of Feb. 5, 1996, at 1 ("Wagster Memo").) During the January 23 meeting, the Board agreed to consolidate Houben's Motorola sales team and the Motorola development team. Additionally, the Board decided to eliminate three positions from the sales team.

On Monday January 29, Wagster told three Motorola team members, including Houben, that they were being fired, and that February 28 would be their last day. The following day, however, CEO DeNicolo instructed Wagster to inform the three Motorola team RIF employees that their last day would be Friday February 2. Kevin Geary, one of Houben's subordinates, was the lone Motorola team member retained through the RIF.

We pause in our recitation to note that the record is unclear regarding one critical fact: whether Telular identified Houben for the RIF before or after she disclosed her pregnancy. The record contains an undated document, titled "Headcount Reduction Schedule", listing Telular employees scheduled for discharge, including Houben. The list identifies the anticipated discharge dates of the RIF employees and contains, we believe, Dan Wagster's handwritten notations. (Telular's 12M Statement, Ex. 6 at HOU 522–23.) But there is no evidence regarding when the list was created, who created it and for what purpose, and whether it was presented to the Board at any one of the three relevant Board meetings.[3]

Telular argues that deposition testimony by Stephen McConnell, Telular's Director of Financial Analysis and Pricing at the time of the RIF, establishes that the decision to fire Houben was made by October 3, 1995. During Autumn 1995, McConnell was given the task of identifying positions at Telular that could be eliminated as part of a possible restructuring. At the deposition, McConnell testified that, in performing this task, he categorized each employee (by name) as either absolutely essential, moderately essential, or not essential. (Telular's 12M Statement, McConnell Dep. at 74.) Although he remembers placing Geary in the "absolutely essential" category, he does not remember how he categorized Houben. (*Id.* at 75.) As to timing and how exactly his categorizations were used by Telular, McConnell is even more vague and equivocal:

> Well, there probably were recommendations and discussions going on in the August–September time frame of 1995. There may or may not have been any written or computer work that was done during that time frame. A date of October 3rd of 1995 sticks out as a date to [sic] where I delivered something to Dan Wagster that had people's names on it.

(*Id.* at 72.) In response to a follow-up question regarding whether this list of people's names included "recommendations as to retaining or not retaining the people," McConnell stated, "At that point in time, I don't know if there was an absolute recommendation with respect to any person." (*Id.* at 73.) Clearly, McConnell's testimony is insufficient

---

**3.** A letter Wagster wrote documenting the Motorola team discharges suggests a possible timing for the list: "A list of terminations at Buffalo Grove ... was developed in early January." (Wagster Memo at 1.) However, the ambiguity of this statement dictates disregarding its implica-

tion: there is no evidentiary connection between the list referred to in the letter and the list contained in the record and, more importantly, "early January" obviously does not establish that the decision to fire Houben was made before she disclosed her pregnancy.

to establish that Telular had already decided to fire Houben by October 3, 1995: there is no evidence linking McConnell's recommendations to Telular's ultimate decision about who to fire; no evidence regarding when, or even if, Telular decided that only "absolutely essential" employees would be retained; and no evidence that McConnell actually recommended discharging Houben. In any event, a recommendation is not a decision. Thus, even if McConnell recommended firing Houben on October 3, Telular has not established unequivocally that it decided to fire Houben before she disclosed her pregancy.

Finally, the record contains evidence that just two weeks before Telular implemented the RIF, Wagster told Houben that the Motorola team would not be effected by any restructuring of the company. (Houben Mem.Att. 1, Houben Aff. at ¶ 33.) A reasonable jury could conclude on this statement alone that Telular had not finalized its RIF plans as of mid-January 1996. Houben has produced evidence creating a genuine issue over the timing of Telular's decision to discharge her. At this point in the litigation, we must read the evidence most favorably to Houben, and therefore assume that Telular did not decide to discharge Houben until after she revealed her pregnancy.

On the day Wagster fired Houben, he instructed her to prepare a memorandum for Mary Beth Flanders outlining her duties and the status of Motorola accounts. Wagster explained that Flanders would be assuming Houben's responsibilities. Houben complied. (Telular 12M Statement, Ex. 1, Memorandum from Houben to Flanders of Feb. 2, 1996.) But shortly thereafter, on February 12, Geary was promoted to "Account Director", Houben's former title, and received a raise of $20,000, which meant he was earning just $5,000 less than Houben had been earning as Account Director. (Houben 12N Statement, Docs. T Series at T1344, Payroll Status Change Form for Geary (describing the change as a promotion to "Account Director" effective 2/12/96).)

4. Telular does not challenge Houben's ability to establish the first three elements of a prima facie case. Thus, although there is evidence suggesting that Motorola executives complained about

This is the factual basis for Houben's claims that she was chosen for discharge because she is a woman, in violation of Title VII, and because she was pregnant, in violation of the Pregnancy Discrimination Act. Telular responded that it discharged Houben as part of the RIF; not because she was a woman and pregnant, but because her position was eliminated. It also stated that Houben was replaced, if at all, by another woman, and that it retained Geary because he was deemed an "essential employee", whereas Houben was not. Telular has filed a motion for summary judgment attacking Houben's ability to establish either a prima facie case of discrimination or that Telular's stated reason for choosing to discharge her was a pretext for invidious discrimination.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To avoid summary judgment, the nonmovant must advance "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "We apply this standard with particular care in employment discrimination cases, where intent and credibility are crucial issues." *Piraino v. International Orientation Resources, Inc.*, 84 F.3d 270, 273 (7th Cir.1996).

## ANALYSIS

Telular's first argument—that Houben cannot establish a prima facie case of sex or pregnancy discrimination—deserves only brief mention.[4] Telular contends that Houben cannot produce evidence that she was replaced because her job was completely eliminated. Telular concludes, therefore, that she is unable to satisfy the fourth prong of a prima facie case as articulated in *McDonnell Douglas*.

In *Collier v. Budd Co.*, 66 F.3d 886 (7th Cir.1995), the Seventh Circuit explained that the fourth element of the prima facie case in RIF cases is not whether the employ-

Houben's performance of her duties, for purposes of the summary judgment motion we assume that Houben can establish that she satisfactorily fulfilled her employment responsibilities.

ee was replaced, but whether the employee was treated less favorably than employees not in the protected class. *Id.* at 890–91. There is no question that Houben can point to male and nonpregnant employees who were not fired in the RIF. In any event, Houben has established a triable issue over whether Geary was in fact her replacement. The evidence shows that less than two weeks after Houben was discharged Geary received a promotion, that his title became that which was formerly hers, and that he received a $20,000 raise which put him within spitting distance of her old salary. A reasonable jury could certainly conclude that Geary "replaced" Houben, even though he did not supervise a sales force as she did. Houben has presented evidence supporting a prima facie case of sex and pregnancy discrimination. Thus, we turn to Telular's more compelling, but ultimately unsuccessful, argument.

Telular advances one principal reason that Houben was not retained: Geary was more valuable to the company on the Motorola account because he was "directly" involved in the Hungary Project. Telular explains that Geary made eight trips to Hungary and conducted many of the face-to-face interactions on the Hungary project.

■ Telular's stated reason for retaining Geary instead of Houben rebuts the presumption of discrimination created by Houben's prima facie showing. Houben therefore is obliged to produce evidence establishing a triable question as to whether Telular's stated reason for her discharge is a pretext for discriminating against her because she is a woman or because she was pregnant at the time of the RIF. *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir.1996); *Piraino*, 84 F.3d at 274; *Collier*, 66 F.3d at 892. Houben's affidavit, as well as several exhibits of the work she performed as the Motorola Account Director, provide such evidence.

In her affidavit, Houben rebuts Telular's argument that Geary had "direct" involvement in the Hungary project whereas she did not. Houben points to specific tasks that she personally performed on that project, thereby establishing a genuine issue as to whether she was "directly" involved:

I was actively involved in the Hungary project from January, 1995[sic] until my employment terminated. I coordinated compliance with technical specifications, including software changes; prepared and presented product and pricing proposals; assisted in preparation of RFP to Motorola (during my 1995 maternity leave); collaborated in preparation of Telular's response to the Motorola award; directed design and implementation of team's product support plan; and guided and instructed other team members, including Kevin Geary, in all aspects of job performance.

(Houben Mem.Att. 1, Houben Aff. at ¶ 17.) Additionally, Houben states that early in January 1996 Geary asked to be removed from the Hungary project; when she complied with the request, she became solely responsible for all actions on the project. (*Id.* at 30–31.) Even more striking, the exhibits submitted by Houben suggest that the Motorola Account Director's responsibilities far exceeded coordination of one project, even one as "crucial" as the Hungary project. (*See, e.g.,* Houben 12N Statement, Geary Docs., Motorola Activity Report Sept.–Oct. 1995 (prepared by Houben); Draft Minutes from Dec. 12, 1995 meeting between Telular and Motorola (prepared by Houben and her counterpart at Motorola).)

This Court is mindful of its limitations, and we are careful not to play the role of a super-personnel department. However, Houben has established a genuine issue as to whether Telular truthfully believed that Geary was better qualified to be the Motorola Team Director than she was. She points to evidence showing her direct involvement in the Hungary project, as well as evidence establishing the breadth of her duties. Telular is left with Geary's eight trips to Hungary, but it does not explain why this made him more qualified to manage Telular's complex relationship with Motorola on all of their mutual projects than was Houben, who already had experience doing just that.

Telular's two remaining proffered reasons for retaining Geary are wholly unavailing. We have already concluded that Houben establishes a factual dispute over the timing of Telular's decision to fire her. There is no

need to address the argument further. Additionally, Telular's argument that Houben cannot show that the RIF was conducted for the purpose of firing her is irrelevant. As stated in *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir.1997), "[e]ven if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its workforce, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers." *Id.* at 1195; *see also Janiuk*, 157 F.3d at 509 n. 5 ("It is indeed undisputed that [the defendant] decided to reduce its work force in order to reduce its operating expenses, but the decisions made in connection with that reduction-in-force still must comply with the ADEA."). Of course, this reasoning applies with equal force to pregnant and female workers.

## CONCLUSION

Houben has set forth facts showing a genuine issue for trial on whether Telular chose to fire her during the RIF because she was a woman and/or because she was pregnant. For this reason, we deny Telular's motion for summary judgment as to Houben's Title VII and Pregnancy Discrimination Act claims. Because Houben abandoned her Family Medical Leave Act claim, we grant Telular judgment on that issue.

As to Houben's state law claims, she has 14 days to respond to Telular's summary judgment motion. Houben need not address Telular's arguments regarding counts four (breach of employment contract), five (breach of implied covenant of good faith), and seven (820 ILCS 115/2) because the existing record establishes factual issues regarding these claims. Specifically, Houben has established a triable issue as to when a sales representative became entitled to commissions on a sale. Therefore, summary judgment is inappropriate on these clams.

Finally, we note that Houben took to heart this Court's request to carefully consider the strengths and weaknesses of her federal causes of action. We now ask Houben to carefully scrutinize the remaining state law claims (counts six, and eight through thirteen). If, having scrutinized these claims and the relevant caselaw, Houben concludes that some of the claims are not viable, we ask that she similarly abandon those claims. If, on the other hand, she decides to pursue any of these claims, she must file a written response by February 25, 1999.

A status hearing will be held in open court on March 3, 1999 at 9:15 a.m. for the express purpose of setting a firm trial date for this lawsuit.