Gina PIRAINO, Plaintiff–Appellant,

v.

INTERNATIONAL ORIENTATION RESOURCES, INC., Defendant–Appellee.

No. 95–2491.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1995.

Decided May 21, 1996.

Lisa Kane (argued), Kane & Associates, Chicago, IL, for Plaintiff–Appellant.

Samuel G. Levin, Siegel, Lynn & Capitel, Northbrook, IL, Bradley B. Falkof (argued), Amy McKeever Toman, James A. Reiman, Barnes & Thornburg, Chicago, IL, for Defendant–Appellee.

Before KANNE and DIANE P. WOOD, Circuit Judges, and SKINNER, District Judge.*

DIANE P. WOOD, Circuit Judge.

International Orientation Resources, Inc. ("IOR") is a company that provides cross-cultural training to American families and individuals who are relocating overseas and to foreign families and individuals moving to the United States for extended stays. Their human relations expertise, however, did not save them from at least one internal employment problem at the company. Gina Piraino, one of IOR's cross-cultural trainers during the latter part of 1990, claims that she was fired in violation of the Pregnancy Discrimination Amendment to Title VII, 42 U.S.C. § 2000e(k), commonly referred to as the Pregnancy Discrimination Act (PDA). Because we conclude that Piraino demonstrated that there were genuine issues of material fact requiring a trial, we reverse the district court's summary judgment for IOR and remand for further proceedings.

**I**

Piraino initially applied for a position as a cross-cultural trainer at IOR in July 1990. Fran Perlman, the Director of Human Resources, Stephanie Derderian, the Director of Training, and Noel Kreicker, the President, all interviewed her for the position. At the time of the interview, she was four months pregnant, but she neither mentioned this fact

---

* The Honorable Walter Jay Skinner, Judge of the United States District Court for the District of Massachusetts, sitting by designation.

nor did any of the IOR representatives learn of it in any other way. IOR offered Piraino the job on August 2, 1990; she promptly accepted and began work on August 6th.

In September 1990, Piraino disclosed her pregnancy to Kreicker, Perlman and Derderian. The initial responses she received were relatively positive. Derderian told her "not to worry," and that "she [Derderian] didn't see that it would be a problem." Kreicker's response was similar, "Well, I'm sure this won't be a problem. We have been through this before." Perlman also said that there shouldn't be a problem, that the company would work it out, and that IOR would put something in writing. None of these officials said anything about any IOR policy (written or unwritten) that was already in existence, even though IOR had a practice of advising applicants about its policies and benefits. In Piraino's case, Perlman had told her about IOR's vacation, sick leave and personal day policies when she offered Piraino the job, and Perlman reviewed the IOR employee handbook with Piraino on her first day of work. In neither conversation did the subject of an unwritten leave of absence or maternity leave policy come up. Instead, when Piraino told Kreicker that she "did not expect [a] paid leave of absence" and asked what the company had in mind, Kreicker said only "Don't worry. We will work it out. There's no problem."

On November 15, 1990, as Perlman had promised, IOR issued its Leave of Absence Policy, effective immediately. The Policy had the following to say on the subjects of unpaid leaves of absence and maternity leave:

*Unpaid Leaves of Absence*

Under certain circumstances, you may be eligible for a leave of absence. The length and conditions of the leave depends [sic] upon:

1. your length of service with IOR
2. the reason for requesting leave

1. *Leaves of absence may be granted to employees who have been with the company for a minimum of one year.*

For employees that have been with the company for less than one year, efforts will be made to place the returning employee into the same or similar position if possible. During any period of leave, IOR reserves the right to fill, alter, or eliminate a vacant position if required by business needs. If a position which is vacant due to an approved leave of absence is filled, IOR will make a reasonable effort to offer the employee an equivalent position when he or she is ready to return. . . .

2. Types of Leave

\*    \*    \*    \*    \*    \*

*Maternity Leave*

Upon completion of a minimum of one year with the company, employees may request up to six weeks leave for maternity. . . . Upon completion of four weeks leave, it is the responsibility of the employee to notify the department manager as to the date of return to work or request additional leave. Failure to notify will be considered as giving notice of voluntary resignation. IOR will hold a position open for a period of six weeks. If at four weeks, an extension is requested and granted beyond the original six weeks leave, IOR reserves the right to fill, alter or eliminate a vacant position if required by business needs.

When Piraino received this policy, she concluded that she would not be able to return to work for IOR under its terms.

Some time in December, Perlman told Piraino that Piraino was under no obligation to report back to IOR on a particular date after her child was born, and that she could "reapply" for a position with IOR when she was ready to return to work. Piraino's last day of work was December 30, 1990—the same day as the baby was born. On December 31, 1990, she notified Perlman of the birth of the baby, and she called Perlman on the first business day of January 1991 to ask whether she needed to submit any kind of written notice for a leave of absence. Perlman responded, "You don't need to do anything. You have voluntarily quit. If you want, you can reapply." On February 15, 1991, Piraino visited IOR's offices with her new baby. Piraino recalled that she asked Derderian whether a position was available and that Derderian said no; Derderian has no memo-

ry of the conversation. Although Piraino did not formally reapply for employment at IOR, she telephoned Derderian in late February or early March 1991 to see if a position had become available during the interim. She was told that one had not.

In the meantime, IOR experienced a downturn in business beginning in the final quarter of 1990 and continuing into the spring of 1991. Although the magnitude of the slowdown is disputed, it is undisputed that IOR reported annual losses for 1990 and 1991. In mid-December 1990, after it was clear that Piraino would be gone for the birth of her baby (and thereafter, pursuant to the November 15 policy), IOR promoted two employees, Linda Hamby and Barbara McDaniel, to the position of part-time trainer. The parties dispute whether Hamby's and McDaniel's prior jobs had been clerical or professional, but it is clear that the two women received additional job responsibilities including some or all of those that Piraino had performed. In April 1991, IOR hired Patrick Coughlin to develop its business programs. Again, although the parties dispute the precise scope of his job, they agree that he conducted the kind of adult training program Piraino had done in addition to performing his marketing tasks.

## II

On September 13, 1991, Piraino filed a complaint with the Equal Opportunity Employment Commission. The Commission issued a right to sue letter, which Piraino received on January 1, 1994. Piraino, in compliance with the statutory time limits, filed a complaint in the district court alleging that IOR violated the PDA. On May 24, 1995, the district court granted IOR's motion for summary judgment. That court concluded that Piraino had to prove her claim of pregnancy discrimination through the use of circumstantial evidence, rather than direct evidence. Before that court, as here, Piraino relied on the timing of IOR's adoption of its unpaid leave of absence policy to show the existence of discrimination. The district court found that IOR had presented "undisputed testimony" that it had "an informal, unwritten leave of absence policy in effect for

four years prior to November 1990," and that the November 15, 1990, written policy simply memorialized the prior unwritten policy. The court found in addition that no inference of discriminatory intent was possible even if there had been no earlier policy, because the November 15 policy was non-discriminatory on its face.

The court then considered Piraino's claim under the now-classic burden-shifting method of proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later cases. It found that Piraino had established her prima facie case, noting that IOR conceded the first three elements: she was pregnant, her performance met IOR's expectations, and she lost her job. For purposes of summary judgment, drawing all reasonable inferences in Piraino's favor, the court also found that IOR effectively replaced Piraino, first by assigning training responsibilities to Hamby and McDaniel in December 1990, and then by hiring Coughlin in April 1991. Based on its earlier conclusion about the leave of absence policy, however, the court concluded that IOR had established legitimate, nondiscriminatory reasons for its actions that Piraino could not refute. The court believed that Piraino "voluntarily resigned" when she took her leave of absence, and that IOR's business needs were insufficient to rehire her in February 1991. It therefore granted IOR's motion for summary judgment.

## III

■ We review the grant of a summary judgment de novo, taking the record in the light most favorable to the party opposing the motion. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). As we have often noted before, we apply this standard with particular care in employment discrimination cases, where intent and credibility are crucial issues. *Id.*

■ The PDA provides that "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to do work." 42

U.S.C. § 2000e(k). As this Court noted in *Troupe v. May Department Stores*, 20 F.3d 734, 738 (7th Cir.1994), this does not impose an affirmative obligation on employers to offer maternity leave or to take other steps to assist pregnant workers, but it does require the employer to treat the employee as well as it would have if she were not pregnant. The question for us is therefore whether Piraino presented enough evidence to warrant a trial on her claim that she was intentionally discharged and then denied reinstatement because of her pregnancy and in violation of the Act.

■ At the outset, we address a rather surprising claim that counsel for IOR advanced at oral argument: namely, that this case isn't about pregnancy discrimination at all because by the time the events in question occurred (the discharge and the refusal to reinstate) Piraino was not pregnant any more. Counsel pointed out, correctly enough, that pregnancy does not last forever, and IOR's actions in early 1991 unquestionably occurred after the birth of Piraino's baby—ergo, no pregnancy discrimination. This theory simply does not accurately reflect Piraino's theory, which asserts in essence that, upon learning of her pregnancy in September 1990, IOR set out to find a way to dismiss her. IOR did so, Piraino continues, either by crafting its leave of absence policy so that she could not qualify, or by implementing its policy to accomplish her discharge, or both. This is therefore not a case in which the claim relates only to an employer's refusal to hire (or reinstate) a mother with a young child, without a hint of any role that the earlier pregnancy played in the decision. Whether it succeeds or fails, it is clear that Piraino's claim alleges pregnancy discrimination.

■ A plaintiff can prove pregnancy discrimination with either direct or circumstantial evidence of discriminatory intent. *Troupe*, 20 F.3d at 736. See also *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir.1993) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 363 (1994). Here, as the district court found, Piraino's "direct" evidence was not enough to raise a genuine issue of fact about the existence of intentional discrimination. Her claims of her supervisors' "cold attitude" toward her and an increase in her workload do not directly allege, and thus cannot directly prove, discriminatory intent. As is usually the case, she must rely instead on circumstantial evidence. In *Troupe*, this Court identified three types of circumstantial evidence of intentional discrimination: (1) a mosaic of evidence which, taken together, would permit a jury to infer discriminatory intent; (2) comparative evidence showing that employees similarly situated to the plaintiff other than in the protected characteristic received systematically better treatment; and (3) pretext evidence, where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief. *Troupe*, 20 F.3d at 736. See also *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 669 (7th Cir.1995).

Piraino's argument falls most comfortably into the first of these three categories: evidence of "suspicious timing, ambiguous statements oral or written, ... and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736. She asserts that IOR did not have any particular leave of absence policy prior to the November 15, 1990 written statement, and she has offered concrete support for her assertion through her own deposition testimony and that of Derderian, Kreicker and Perlman. It is not disputed that Perlman briefed Piraino on IOR's vacation, sick leave and personal day policies at the time of the job offer, without saying anything about unpaid leaves of absence or maternity leave. Perlman reviewed the IOR employee handbook with Piraino on her first day of work, and not a word was said about either subject again, nor was anything included in the employee handbook. Furthermore, the responses Piraino received in September 1990 from the responsible IOR officials when she disclosed her pregnancy contained no reference to any unwritten policy, at a time when the relevance of any such policy had surely become apparent. To the contrary, Derderian, Kreicker and Perlman all used words that a jury could find indicated that the response to Piraino's pregnancy would be *ad*

*hoc,* not based upon some undisclosed "policy."

This Court was faced with a similar situation in *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035 (7th Cir.1993), in a case brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* In *Sarsha,* the plaintiff claimed that he had been fired as a result of age and gender discrimination, while Sears alleged that it had fired him for violating an unwritten policy prohibiting employees from dating one another. Like IOR here, Sears tried to defend its summary judgment on the ground that the record was clear that the alleged policy existed. *Sarsha* showed, however, that Sears had no written policy prohibiting employee dating, and he presented substantial evidence in response to Sears' motion for summary judgment that, if believed by a jury, would have shown that there was no unwritten policy either. This was enough, the Court found, to establish a genuine issue of material fact about the alleged policy: "[W]hen the existence of a uniform policy or practice is in doubt, it cannot serve as a reason for discharging [the plaintiff]." *Sarsha,* 3 F.3d at 1040.

Insofar as IOR relies on the existence of a policy regarding unpaid leave and maternity leave that was in existence prior to the November 15, 1990 written policy, we conclude that *Sarsha* controls the outcome here. We cannot say whether a jury would believe Kreicker's and Perlman's testimony that an unwritten policy existed, or whether it would infer from the course of events and statements made to Piraino that IOR concocted a new policy that excluded Piraino for discriminatory reasons. All we can say is that Piraino came forward with enough evidence to defeat the summary judgment motion on this ground, and that the case must go forward through the next stages. (As we noted in *Sarsha,* this decision does not and cannot constrain the district judge with respect to any possible ruling on a motion for judgment as a matter of law at trial, because such a motion would have to be considered in light of the evidence actually produced at the trial.)

IOR also argued that Piraino "voluntarily quit" her job, both to show that she was not subject to an adverse employment action by reason of pregnancy and to distinguish her from other non-pregnant employees who, Kreicker testified, used the alleged unwritten policy prior to November 1990. Since the existence of an unwritten policy prior to November 15 is in dispute, IOR cannot rely on its alleged terms to prove that Piraino's December 30 departure indisputably amounted to a "voluntary" resignation. Both the terms under which she left and her expectations, taken in the light most favorable to her, show that she thought she was taking a leave of absence. A jury could find that her call to Perlman in early January 1991 asking whether she needed to submit a written notice for a leave indicated clearly that she did not believe she had voluntarily resigned. Indeed, nothing in the November 15 policy itself would have alerted her to such draconian consequences for her brief absence. Although the policy appears to create an entitlement to an unpaid leave of absence and a maternity leave for employees who have worked for the company for a minimum of one year, the Unpaid Leave section also addresses the rights of employees who have been with the company for less than one year. It is striking that it does *not* say that any effort on the part of such an employee to take even a brief unpaid leave will be considered the equivalent of a "voluntary resignation." Instead, it says that "[f]or employees that have been with the company for less than one year, efforts will be made to place the returning employee into the same or similar position if possible." The only mention of "voluntary resignation" occurs in the maternity leave section, where it states that a failure to notify the company of the expected date of return to work will be considered as giving notice of voluntary resignation.

The evidence suggests that Piraino was not guilty of keeping IOR in the dark about her intentions to return to work. She called Perlman the day after her child was born; she called again a few days later to make sure her paperwork was in order; she visited IOR six weeks after the birth; and she called again a few weeks later. Naturally, these events were affected by IOR's position that

she in fact had resigned, but at this stage we are required to look at the events as Piraino sees them. Viewed this way, IOR cannot escape a trial on the ground that Piraino's actions amounted to a voluntary resignation from the company.

Finally, both IOR and the district court emphasize the facial neutrality of the leave of absence policy adopted on November 15. Far from treating pregnancy more unfavorably than other conditions that might necessitate an unpaid leave, it singles out maternity leave for a guaranteed period of a full six weeks leave, with *no risk of having the employee's position permanently filled with a replacement worker.* If the policy itself is unobjectionable, then why should IOR suffer because of the timing of its adoption?

■ The answer to that question goes to the heart of the issue in a discrimination case. Facial neutrality is not enough to prevent a finding of discrimination, if the adoption of the policy was designed to discriminate against Piraino herself on the basis of her pregnancy. Here, Piraino has alleged just such a disparate treatment case. Her allegations could fit within both the first and the third types of proof identified in *Troupe.* Using the "mosaic" approach, Piraino could show that IOR's allegation that it had an unwritten policy regarding leave was untrue, that the timing of the adoption of the written policy was designed to take care of her case, and that other statements would support a jury finding of intentional discrimination on the basis of her pregnancy. Using the "pretext" approach, she could argue that IOR's stated reason for firing her (or for construing her actions as a "voluntary resignation")—its unwritten and written policy—was a pretext for its action, and that it really adopted the policy at the time it did only as a smokescreen or excuse for firing a pregnant employee. In either of these cases, we agree with the district court that Piraino satisfactorily established her prima facie case, for the reasons stated by that court. Although IOR takes issue with the district court's conclusion that the facts construed most favorably to Piraino show that IOR sought a replacement for Piraino, we agree with the district court that the evidence relating to Hamby, McDaniel and Coughlin was enough to establish the prima facie case.

The district court's judgment for IOR is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.