In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3415

Equal Employment Opportunity Commission,

Plaintiff,

and

MICHAEL NICOSIA,

Intervening Plaintiff-Appellant,

v.

YELLOW FREIGHT SYSTEM, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2725--Charles P. Kocoras, Judge.

Argued APRIL 4, 2000
Re-argued En Banc NOVEMBER 29, 2000
Decided June 12, 2001

   Before FLAUM, Chief Judge, POSNER, COFFEY,
EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER,
DIANE P. WOOD, EVANS, and WILLIAMS, Circuit
Judges.

   COFFEY, Circuit Judge.  On May 4, 1998,
the Equal Employment Opportunity
Commission (EEOC) filed a single count
complaint in the Northern District of
Illinois against the Defendant-Appellee
Yellow Freight System, Inc., alleging
violations of the Americans with
Disabilities Act based on Michael
Nicosia's, an employee of Yellow Freight,
HIV/AIDS disability./1 Specifically, the
EEOC alleged that Yellow Freight
terminated Nicosia because of his AIDS
related cancer and in retaliation for
Nicosia's filing of a complaint with the
EEOC. Upon the defendant's motion, the
district court granted summary judgment
in favor of Yellow Freight. We affirm.

I.  BACKGROUND

   Nicosia began his career with Yellow
Freight in August of 1990 as a dockworker

at the company's Chicago Ridge, Illinois, Terminal. At that time, Yellow Freight, a trucking services company, employed some 550 dockworkers who loaded and unloaded freight trailers, checked the pieces count, and weighed shipments. Initially, Nicosia was a "casual worker" for the company. As a casual worker, Nicosia served as an on-call replacement worker./2

In February 1991, Nicosia was elevated to a full-time dockworker./3 As a full-time dockworker at the Chicago Ridge Terminal, Nicosia was supervised by Gerald Sendziol. Sendziol was responsible for making decisions at the terminal with respect to leaves of absence and whether or not to terminate a particular employee.

It is important to note that Yellow Freight has a five-step progressive discipline procedure to deal with employees who accumulate numerous and excessive absences./4 Pursuant to the system, an employee who violates the company's attendance policy would be subject to the following five steps: 1) a coaching session; 2) a letter of information; 3) a written warning; 4) suspension; and finally 5) termination./5 It is undisputed that since 1992 Yellow Freight has terminated over 90 employees pursuant to its progressive disciplinary system for excessive absenteeism./6

To say that Nicosia's attendance record was woeful is somewhat of an understatement. In 1991, Nicosia's first year as a full-time employee with Yellow Freight, he was scheduled to work 113 days, but left work early two times for illness and called in sick thirty-seven times./7 In 1992, his work attendance record was not much better when, out of 171 scheduled work days, he left work early because of an illness on one occasion, and took three personal days and twelve sick days. In the following year, Nicosia was absent from work more than half of the 242 days that he was assigned to work (126 absences for illness, left work early four times, and three unexcused absences). In 1994, out of 227 scheduled work days, he took another forty-seven sick days, left work early three times, and had three unexcused absences.

In November of 1995,[8] Nicosia called Sendziol and told his supervisor that he needed time-off for an unspecified medical problem. Sendziol told him that he was ineligible for family and medical leave, but that he could take a 90-day unpaid leave of absence. Presumably because Nicosia did not want to be gone that long, he decided to call in sick for the next two weeks.

In December 1995, Nicosia was diagnosed as HIV positive. In January 1996, Nicosia's condition deteriorated and he was diagnosed with Kaposi's sarcoma, an AIDS-related cancer. On January 12, 1996, Nicosia sent a letter to Sendziol informing the company of his medical condition.

After being diagnosed with Kaposi's sarcoma, Nicosia's work attendance plummeted even further in 1996. In fact, he called in sick every working day during the months of January, February, and March. As a result of Nicosia's poor attendance, Yellow Freight initiated its progressive disciplinary system.

On June 14, 1996, the company initiated step one (coaching session) with Nicosia. On June 24, 1996, the company sent Nicosia a letter of information (step two). Nicosia responded to the letter of information with the following letter addressed to Sendziol and dated June 26, 1996:

I had advised you of my terminal illness on January 12, 1996 by messenger service. I have rights due to this illness under the Americans with Disabilities Act. Every time I have been off work due to illness, my doctor has faxed you medical documentation.

After another series of absences, Yellow Freight issued a written warning (step three) on July 15, 1996. Nicosia responded with a letter stating that he had been diagnosed with cancer.

The company then sent Nicosia an ADA accommodation review form along with a letter stating that Yellow Freight understood that Nicosia was requesting an accommodation under the ADA. The form required that Nicosia list his condition, describe the accommodation, if any, he

was requesting, and to identify his treating physicians and medical providers.

Despite receiving the form, Nicosia failed to comply and fill it out. Instead, he returned the uncompleted form along with a letter. In the letter, Nicosia stated that he was "requesting no particular considerations at this time other than the resources necessary to perform my job and reasonable accommodations necessary to monitor and maintain my health status." He also stated that he wanted "sick days, if needed[,] without being penalized." Finally, he stated that he was "working" to perform the responsibilities and duties of a dockworker.

After Nicosia missed 10 out of the next 19 calendar days, the company proceeded to step four and suspended Nicosia for one day on August 5, 1996. In response to the suspension, Nicosia sent a letter promising to "report to work every day to fulfill my duties."

On October 15, 1996, Nicosia filed charges with the EEOC claiming that Yellow Freight had disciplined him because of his disability and also that it had denied him a reasonable accommodation. As noted earlier, the company terminated Nicosia on December 16, 1996, for excessive absenteeism./9 Following his termination, Nicosia filed a second charge with the EEOC alleging that he had requested an accommodation, had been denied an accommodation, and that he was illegally discharged. He also alleged that Yellow Freight had retaliated against him for filing his October 15th EEOC charges.

On May 4, 1998, the EEOC filed suit against Yellow Freight claiming that the freight company had discriminated against Nicosia in violation of the ADA and, furthermore, that it had retaliated against Nicosia for his filing of a complaint with the Commission. As mentioned before, Nicosia intervened in the suit.

On August 12, 1999, the trial judge granted summary judgment in favor of Yellow Freight and concluded that: 1) Nicosia was not a "qualified individual" under the ADA; 2) regular attendance at

the job site was an "essential function of Nicosia's job"; 3) Nicosia's request for "sick days, if needed[,] without being penalized" was not reasonable as a matter of law; and 4) there was no causal connection between Nicosia's filing of an EEOC complaint and his termination. Nicosia, not the EEOC, appeals.

## II.  ANALYSIS

The ADA mandates that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. sec. 12112(a). The law also requires that "[t]he plaintiff bears the burden of proof on the issue of whether he is a 'qualified individual' under the ADA." Nowak v. St. Rita High Sch., 142 F.3d 999, 1003 (7th Cir. 1998). Furthermore, to establish a prima facie case under the ADA, Nicosia must demonstrate that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. sec. 12111(8); see Feldman v. American Mem'l Life Ins. Co., 196 F.3d 783, 789-90 (7th Cir. 1999). Thus, the critical question is whether an "essential function" of Nicosia's regular full-time position with Yellow Freight was regular attendance, and if so, did he fulfill that "essential function." Also,

the fact that [Yellow Freight] had infinite patience [with regard to Nicosia's poor attendance] does not necessarily mean that every company must put up with employees who do not come to work. Nor must every company hire replacements for absent employees and call that a reasonable accommodation. The issue before us is, when is enough, enough?

Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999).

At the outset, let us be clear that our

court, and every circuit that has addressed this issue, has held that

in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs. As the Tyndall court put it:

[A]n evaluation of the quality of Tyndall's performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform any of his job functions, essential or otherwise."

Id. at 484-85; see also Jovanovic v. In-Sink-Erator, 201 F.3d 894, 899-90 (7th Cir. 2000); Corder v. Lucent Techs., Inc., 162 F.3d 924, 928 (7th Cir. 1998); Haschmann v. Time Warner Entm't Co., L.P., 151 F.3d 591, 602 (7th Cir. 1998); Nowak, 142 F.3d at 1003; accord Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998); Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 759 (5th Cir. 1996); Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1516 (2d Cir. 1995); Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994); Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994).

Specifically, this circuit has held that

We think it [is] fair to conclude that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs.

Waggoner, 169 F.3d at 484. While Waggoner made clear that "[w]e are not establishing a hard-and-fast rule that no absences from work need be tolerated," it also made clear that no business is "obligated to tolerate erratic, unreliable attendance." Id. at 485 (citing Haschmann, 151 F.3d at 601). Indeed,

the absence of employees is disruptive to any work environment. However, it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job.

Haschmann, 151 F.3d at 602. In Jovanovic, 201 F.3d at 899-90, this court dealt with a case similar to the one at hand:

Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job. This is especially true in factory positions, such as Jovanovic's, where the work must be done on the employer's premises; maintenance and production functions cannot be performed if the employee is not at work.

Nicosia's employment with Yellow Freight is similar to the factory worker in Jovanovic in that his job as a forklift driver "must be done on the employer's premises." Id. And, it is undisputed that "the ability to maintain good attendance" and the ability "to work on" available shifts "plus any required overtime" were listed as "minimum qualifications" in the Yellow Freight material given to all employees, including Nicosia, describing the full-time dockworker position.

Furthermore, it is undisputed that Nicosia was a full-time employee and not a casual, temporary, part-time, orsubstitute employee, nor did he ever have the discretion or the right to decline work when he chose to do so. While Nicosia began his employment with Yellow Freight as a part-time employee, he was elevated to a full-time position as the result of seniority, training, and experience, and had an assigned, definite, and specific work schedule.

A. Qualified Individual

Turning to the question of whether Nicosia was fulfilling the essential requirements of his job (regular job attendance), the undisputed facts reveal that he was not. As previously discussed, the record reflects that

Nicosia was disciplined by Yellow Freight (as were some 90 chronically absent employees before him) well before he informed Yellow Freight that he had been diagnosed with AIDS-related cancer on January 12, 1996. In fact, from 1991 through 1993, his employer warned Nicosia on six separate occasions that his work attendance record was not only substandard but also unacceptable. Furthermore, in 1994 and 1995, Nicosia received four "coaching sessions" and five letters (three letters of information and two written warnings) re garding his pattern of excessive absenteeism. Because the company had a policy of allowing workers to start at step one if they completed nine months of continuous employment without receiving a disciplinary action, there were few opportunities for Yellow Freight to initiate steps four (suspension) and five (termination) before 1996.

The unchallenged record in this case reflects that Yellow Freight bent over backwards to accommodate Nicosia in spite of his long history of poor work attendance. Nicosia was repeatedly warned and reprimanded, and given numerous opportunities to improve his work attendance record. It was Nicosia's woeful attendance record that forced Yellow Freight into the position that it could no longer justify Nicosia's employment.

As we have stated in a number of discrimination cases, "our role is not to second guess the business decisions of a company and inquire as to whether the goals set by management demand 'too much' from its employees, nor to make things less difficult for those who come before us, regardless of the law." Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1091 (7th Cir. 2000) (citation and internal quotations omitted). After reviewing the record and considering Nicosia's poor attendance record, we are convinced that Nicosia was unable to, and failed to, satisfy his burden of establishing that he is a "qualified individual" under the ADA. We thus hold that Yellow Freight is entitled to summary judgment.

B.  Reasonable Accommodation

With respect to the question of reasonable accommodation, Nicosia, in an

August 1, 1996 letter to Yellow Freight, stated that he was requesting "no particular considerations at this time other than the resources necessary to perform my job and reasonable accommodations necessary to monitor and maintain my health status, which would include sick days, if needed[,] without being penalized." Here again, the employee has the burden of "produc[ing] sufficient evidence to establish a genuine issue of material fact as to his ability to perform the essential functions of the job with reasonable accommodation." Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 564 (7th Cir. 1996).

This court has held that similar requests for unlimited "sick days, if needed[,] without being penalized," are not reasonable as a matter of law. See, e.g., Waggoner, 169 F.3d at 485 (denying a request for an accommodation for unlimited time off by a production employee who was absent or tardy forty times in her 20-month tenure). Additionally, businesses are "not obligated to tolerate erratic, unreliable attendance or to provide an accommodation which would impose an undue hardship on the business." Id. As this court has stated,

[w]e do not dispute that a business needs its employees to be in regular attendance to function smoothly; the absence of employees is disruptive to any work environment. However, it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job.

Haschmann, 151 F.3d at 602.

It is interesting to note that Yellow Freight, in an attempt to alleviate Nicosia's work attendance problems, offered Nicosia an opportunity to take a 90-day leave of absence (which he refused to accept), and followed-up by sending him an ADA accommodation review form (which he refused to fill out). Nicosia responded to this attempt by sending a certified letter, including the uncompleted accommodation form, stating that he had received the accommodation form and was requesting, as stated

before, an open-ended, unlimited amount of "sick days, if needed[,] without being penalized." According to Nicosia, he refused to complete the accommodation form because he "was requesting . . . sick time due to . . . illness, and really didn't see that on [the] form" and thought the letter he sent in response "would explain more."

In Jovanovic, 201 F.3d at 899 n.9, this court noted that

the only imaginable accommodation would be an open- ended schedule that would allow Jovanovic to come and go as he pleased. We would be hard-pressed to imagine a manufacturing facility that could operate effectively when its employees are essentially permitted to set their own work hours, and we thus reject such a schedule as an unreasonable accommodation under the circumstances of this case. See Waggoner v. Olin Corp., 169 F.3d 481, 485 (7th Cir. 1999) (holding "as a matter of law" that employee's desire "to miss work whenever she felt she needed to and apparently for so long as she felt she needed to" was not a reasonable accommodation for someone employed as a production worker).

Additionally, this court recently noted that a plaintiff

requested several accommodations, including "an 'unpredictable' amount of time off from work should her symptoms so demand." Then she took paid administrative leave and also one year of benefits under the company's Sickness & Accident Disability Plan. Finally, when she cut short another independent medical evaluation, she was fired. These facts, it should come as no surprise, easily led us to conclude that [plaintiff] was not a qualified individual with a disability under the ADA.

Waggoner, 169 F.3d at 484 (discussing Corder, 162 F.3d at 924). In any event, we are of the opinion that under the established law of this circuit, Yellow Freight's efforts during the "accommodation process" were sufficient, especially given Nicosia's unreasonable request for unlimited time off.

The district court properly found that Yellow Freight's efforts at interacting

with Nicosia regarding a "reasonable accommodation" were sufficient:

Sendziol in fact discussed with Nicosia the possibility of a 90-day medical leave, but Nicosia was unhappy with that option. Eventually Yellow Freight sent to Nicosia a 2-page Accommodation Review Form, which sought medical information and Nicosia's perspective on an appropriate accommodation. In response to Yellow Freight's accommodation inquiry, Nicosia wrote that he wanted "no particular considerations at this time other than . . . sick days, if needed, without being penalized."

This certainly is the beginning of the reasonable accommodation process, and was only met with unmanageable demands on the part of Nicosia. We refuse to force employers to the negotiating table in the face of demands of this nature, and hold that Yellow Freight fulfilled its burden under the law, especially in light of the fact that Nicosia had fashioned a poor attendance record for himself well before he was diagnosed with AIDS. For as we have explained, "[a]n employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996).

To hold otherwise would unreasonably expand the reaches of the ADA and ignore the plaintiff's burden to demonstrate that he is a "qualified individual." Although the plaintiff's medical condition is most unfortunate, we are convinced that Nicosia does not have a remedy under the ADA. As this court stated in Waggoner, 169 F.3d at 484:

[r]ather than attempting to show that [he] is a qualified individual, however, [Nicosia] seems to want to turn the ADA on its head. It is as if [he] thinks that rather than ensuring that [he] be allowed to work, the ADA requires [Yellow Freight] to provide [him] with a job but not require that [he] regularly perform it. Rather, [Yellow Freight] must hire another employee to do the job for [him] while [he] remains a full-time employee. The Act does not go so far. The ADA protects an important, but finite, universe of people.

C.  Retaliation Claim

   Nicosia next claims that Yellow Freight retaliated against him for filing an EEOC complaint in October of 1996. "A prima facie case of retaliation is made when the plaintiff shows that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by his employer; and (3) there is a causal link between the protected expression and the adverse action." Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996) (citing Brenner v. Brown, 36 F.3d 18, 19 (7th Cir. 1994)). Because Nicosia clearly engaged in protected expression by filing the EEOC complaint, only the last two elements of the prima facie case are at issue.

   The district court concluded that the evidence in the record failed to demonstrate that Sendziol, the person who discharged Nicosia, was aware of the fact that Nicosia had filed an EEOC charge. Additionally, the judge found that the temporal link between the charges and the firing was insufficient to establish liability.

   With respect to Sendziol's knowledge that Nicosia had filed an EEOC charge, the only evidence in the record is Nicosia's own (and late) affidavit. In his affidavit, Nicosia asserted that he had passed out approximately 20 copies of his EEOC complaint to his co-workers and that he mailed copies of the complaint to Sendziol and to the president of Yellow Freight./10

   The problem with Nicosia's affidavit is that it was filed late and that it contradicted testimony he gave in an earlier deposition. In his deposition, Nicosia stated that he told John Peterson about the charges and that Peterson told Marilyn Brewer. Nicosia was then asked: "Who, if anyone, else besides John Peterson did you tell or inform that you had filed an EEOC charge with [sic] Yellow Freight?" In response to the question, Nicosia answered that he thought he had also told Jeff Kuchan and George Hagle. Nicosia never mentioned Sendziol.

   "As a general rule, the law of this circuit does not permit a party to create

an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir. 1996). The affidavit, as applied to Sendziol, falls squarely within our rule.

   The question at the deposition clearly invited Nicosia to list anyone else whom he had told about the EEOC complaint. Furthermore, he obviously understood that this was his chance to offer additional names because he named Peterson and Brewer. The fact that he did not include Sendziol as a person whom he had informed about his EEOC charge makes his affidavit, in which he claims he informed Sendziol of the EEOC charge, contradictory. Therefore, the district court had no obligation to consider it. Id. Finally, we agree with the district court that the temporal proximity of Nicosia's termination with his filing of an EEOC charge (some six weeks) is insufficient to establish retaliation. See, e.g., Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1034 (7th Cir. 1999); Bermudez v. TRC Holding, Inc., 138 F.3d 1176, 1179 (7th Cir. 1998); Hughes v. Derwinski, 967 F.2d 11687, 1174-75 (7th Cir. 1992).

   The decision of the district court is

AFFIRMED.

FOOTNOTES

/1 Nicosia intervened in the district court action as a party plaintiff pursuant to Fed. R. Civ. P. 24(a).

/2 Yellow Freight used its casual workers if the workload on a particular day required additional workers or if its regular workers were sick, on vacation, or on disability leave.

/3 As a full-time dockworker, Nicosia received several benefits, including vacation and sick leave, as well as pension payments.

/4 The dissent suggests that we have accepted Yellow Freight's word that such a policy existed and for the content of that policy. But we do not see the content of the attendance policy as in dispute. Indeed, it is interesting to note that the dissent itself recites the same five-step progressive discipline policy that we outline here.

/5 Employees were able to start at step one if they were able to complete nine months of continuous work without a disciplinary step being taken.

/6 The dissent suggests that because the record contains no detailed information about the reasons why particular employees' absences were deemed excessive that no inferences can be drawn from the fact that the policy was used. In support the dissent hypothesizes that if Yellow Freight had disciplined only members of one racial group and forgiven all others that it could not say it was enforcing its policy in an even-handed manner. Strangely though the record contains no evidence that Yellow Freight systematically applied the attendance policy in a discriminatory fashion--and Nicosia does not make such a claim. In any event, the fact that Yellow Freight did terminate over 90 employees pursuant to the attendance policy is evidence that the policy did exist and that Yellow Freight did take attendance problems seriously.

/7 The number of days that Nicosia was scheduled to work and the number of his absences do not include vacation days, jury duty, the five annual paid sick days that he is afforded under the collective bargaining agreement, nor his countless worker's compensation absences. However, for the record, Nicosia accumulated a total of 294 worker's compensation days from 1991 through 1996.

/8 For the record, his work attendance did not improve in 1995; out of the 181 scheduled work days, he called in sick fifty times, left work early three times, and had one unexcused absence.

/9 While Nicosia was terminated on December 16, 1996 for excessive absenteeism, he was ordered reinstated by an arbitrator (without back pay or benefits), and was a Yellow Freight employee at the time this case was orally argued.

/10 Nicosia attached copies of the letter to the president, the U.S. Postal Service certified mail receipt, and the fax confirmation sheet to this affidavit.


  DIANE P. WOOD, Circuit Judge, with whom RIPPLE, ROVNER, and WILLIAMS, Circuit Judges, join, dissenting in part and concurring in part.  It is curious that the full court decided to hear this case en banc, given the fact that there is no significant disagreement among us on the governing legal principles. Here, this court has been asked to review a district court's decision to grant summary judgment for an employer, Yellow

Freight System, Inc., in a case brought under the Americans with Disabilities Act, 42 U.S.C. sec. 12101 et seq. Normally in such a case, when a panel studies a record and concludes either that it does or it does not present genuine issues of material fact warranting trial, that is the end of the matter unless the full court is concerned about the broader legal principles the case involves. Here we have not followed that practice. As I hope to make clear in this dissent, I have little quarrel with the broad outline of the legal rules governing the ADA that the majority has recited. Its presentation of the facts in this record, however, contains serious omissions. When the full record is taken into account, I respectfully submit that it demonstrates that the plaintiff-intervenor, Michael Nicosia, was entitled to a trial on his ADA discrimination claim and his ADA accommodation claim. I agree with the majority that he failed to present enough to survive summary judgment on the retaliation claim, and I thus concur in that part of its judgment.

I

At the risk of repetition, I believe it is necessary to re-state the facts that were before the district court for purposes of the summary judgment motion, so that the full context of Nicosia's claim can be appreciated. As the majority points out, Nicosia was a dockworker with the misfortune of first discovering that he was HIV positive, and later developing symptoms of full-blown AIDS. His employer Yellow Freight fired him at the end of 1996, after a series of exchanges about his serious problems with absenteeism and the accommodations he might need because of his medical condition. Our task at this time is to decide whether, taking the facts in the light most favorable to Nicosia, a trier of fact could ultimately find that Yellow Freight was behaving in a discriminatory manner when it terminated Nicosia or that it failed to comply with its ADA-based duty to accommodate him. Given the majority's opinion, it is also important to stress that Nicosia does not have the burden of showing that the trier of fact inevitably would find for him. Neither he nor most summary judgment opponents could sustain such a burden. I thus do not disagree with the majority that under one permissible view of the facts the trier of fact might also find for Yellow Freight. My only point here is that there are genuinely disputed material facts that the majority has overlooked or assumed away.

As we know, Nicosia began his job as a dockworker for Yellow Freight in August 1990, in the Chicago Ridge Terminal, in the "casual worker"

category. Yellow Freight used its casual workers in a variety of circumstances: when the workload was heavy, or when its regular workers were sick, on vacation, or on disability leave. The need for casuals varied widely from day to day--one day none might be necessary, and the next the company might need 40. In February 1991, he became a full-time dockworker, working under the supervision of Chicago Ridge Terminal Operations Manager Gerald Sendziol. Sendziol was responsible for making decisions at the terminal with respect to leaves of absence, and he also had the authority to fire unsatisfactory employees.

My first quarrel with the majority's portrayal of the facts concerns Yellow Freight's alleged attendance policy. Not only does the majority assume that such a policy existed, but it also accepts Yellow Freight's word for what the content of that policy was. The facts underlying those assumptions are, however, disputed in this particular case. Before proceeding with a substantive analysis of Nicosia's case, therefore, we must look at the facts in the record that pertain to exactly what policy Yellow Freight had with respect to absences for its regular dockworkers. We must consider those facts, as all facts on summary judgment, in the light most favorable to Nicosia, the non-moving party. Krocka v. City of Chicago, 203 F.3d 507, 513 (7th Cir. 2000).

Here is what the summary judgment evidence showed. The collective bargaining agreement ("CBA") between Yellow Freight and its regular employees provided that employees would be entitled to five paid sick days per year. In addition, the CBA provided for family and medical leave of up to a total of twelve weeks on unpaid leave for employees who had worked for the company a minimum of 12 months and 1250 hours during the prior 12-month period. The CBA also allowed employees to apply for leaves of absence that could last up to 90 days, with the possibility of extensions "for like periods." The CBA set no minimum number of days for a leave of absence, although the record indicated that Sendziol told Nicosia that there was a 90-day minimum. When an employee was out on a leave of absence, Yellow Freight filled in using both its casual workers and the bottom 10 percent of its seniority list.

Thus, construing the CBA favorably to Nicosia, it was easily possible for someone to be absent well in excess of the five days of paid sick leave. Furthermore, Nicosia presented additional testimony that the majority has ignored that showed that Yellow Freight's approach to attendance was far from strict. While, as the majority points out, Yellow Freight had a five-step disci-

plinary process, it had no objective written attendance policy that indicated what number or constellation of absences would lead to particular types of discipline. At the Chicago Ridge Terminal, it was entirely within Sendziol's discretion to determine when a particular employee's absences became "excessive" and how rapidly to proceed through the disciplinary process. The record (including Nicosia's own sporadic attendance and disciplinary history prior to 1996, discussed infra) forecloses concluding at this stage that Sendziol exercised his discretion according to any particular objective criteria, such as, for example, whether the employee had multiple intermittent absences or an individual longer-term absence. As his own deposition testimony indicates, Sendziol decided how to handle individual employees' absences on an essentially ad hoc basis. After explaining that "[e]ach case is by itself," he gave as an example a man with a broken leg, who might need far more than the five days mentioned in the CBA-- as he put it, such a worker would need to be "off for whatever length of time." Another example he gave was of a man with pneumonia, for whom he indicated that a three-week leave would be acceptable. Sendziol decided whether absences were excessive and what if any disciplinary action was appropriate based on his assessment of the nature of the particular employee's problem.

   Yellow Freight used its five-step progressive discipline system to deal with employees whose absences, according to these highly subjective criteria, were excessive. As the majority notes, the steps were (1) a coaching session, (2) a letter of information, (3) a written warning, (4) suspension, and finally (5) termination. Employees were able to start afresh with these five steps, however, if they were able to complete nine months' work since the last discipline without a new measure being taken. The record indicated that since 1992, over 90 employees had been terminated for excessive absenteeism, but it contained no information about why particular employees' absences had been deemed excessive. This lack of detail makes it impossible to draw any inferences from the fact that the policy was used. If, to take a purely hypothetical example, Yellow Freight had terminated only members of one racial group for absenteeism, and it had forgiven similar attendance records in other employees, its actions would obviously not suggest that it was enforcing its attendance policy in an even-handed manner. The same is true here: while it may have terminated over 90 employees over the years, we have no way of knowing whether those terminations were without regard to the type of disability that is now protected by the ADA. Only if the record showed that the terminations were

nondiscriminatory would this be useful evidence.

Nicosia had a poor attendance record, but his problems did not prompt Yellow Freight to move beyond step 3 of its progressive disciplinary policy until after he informed Sendziol that he was ill. The majority comments, ante at 10, that Yellow Freight's policy of erasing earlier disciplinary actions if an employee completed nine months of continuous action without a new infraction meant that it had "few opportunities" to initiate steps 4 and 5 before 1996. That may be one way of looking at this evidence, but it would be equally possible for a trier of fact to consider that it meant that Nicosia managed somehow to comply with Yellow Freight's rules for significant periods of time, and thus to re-start the clock for disciplinary purposes. In either case, no one disputes that Nicosia was out for substantial periods of time every year that he was employed by Yellow Freight. These absences were a mix of sick days, workers' compensation leave, personal days, paid vacation, unexcused absences, and "Company Convenience" days. ("Company Convenience" days were offered to employees when there was not enough freight on a particular shift to keep all employees busy.) Before he informed the company of his illness, Nicosia never received more than a written warning (step 3). Sendziol's tolerance for his behavior did not begin to change until November of 1995, when Nicosia called Sendziol and told him that he had a medical problem and needed some time off. Sendziol told him that he was ineligible for family and medical leave (for reasons that are unclear), but that he could take a 90-day (unpaid) leave of absence. Nicosia did not want to be gone that long, so he decided just to call in sick for two weeks.

In December 1995, Nicosia was provisionally diagnosed as HIV positive; the diagnosis was confirmed the next month, when he was also diagnosed with Kaposi's sarcoma, which is a cancer associated with AIDS. On January 12, 1996, Nicosia sent a letter to Sendziol. The letter informed Sendziol that Nicosia's health was "impacted by the Human Immunodeficiency Virus." Sendziol did not discuss the letter with Nicosia, but he apparently talked about it with everyone else at the terminal. The day he received the letter, the news of Nicosia's illness spread like wildfire. Evidently embarrassed or concerned about prejudice, Nicosia started a counter-rumor that he was suffering from leukemia. Yellow Freight does not contest the fact that he was indeed HIV positive and suffering from AIDS-related diseases.

Initially, Nicosia did not provide Yellow

Freight with medical documentation of his condition or information about his treatment or potential limitations. During the first three months of 1996, however, he was frequently absent from work because of his illness. (Indeed, his absences during the prior few years may also have been related to his medical condition; although he was not formally diagnosed with HIV and AIDS until 1995, his doctors stated that his symptoms were such that he may have been suffering from the disease for years preceding his diagnosis.) Between January 1, 1996, and June 12, 1996, Nicosia was absent more than half the time--all or part of 90 days, not including his five days' paid sick leave. He provided doctors' notes excusing these absences, although the notes did not provide detailed descriptions of his condition, needs, or prognosis. Yellow Freight never informed him that the notes were inadequate.

What Yellow Freight did do, equipped with the knowledge that it had an HIV positive employee on its hands, was to begin taking Nicosia through the progressive disciplinary regime with a coaching session (step 1) on June 14, 1996. Over the following 10 calendar days, he was absent for all or part of three days. He received a letter of information (step 2) on June 24. On June 26, Nicosia responded with the following letter to Sendziol:

I had advised you of my terminal illness on January 12, 1996 by messenger service. I have rights due to this illness under the Americans with Disabilities Act. Every time I have been off work due to this illness, my doctor has faxed you medical documentation.

In the three weeks following June 24, Nicosia was absent ten more days. Yellow Freight promptly responded with a written warning (step 3) on July 15. Nicosia replied with a letter indicating that he had been diagnosed with cancer.

Nicosia's letter prompted the human resources department to think about the accommodations requirement of the ADA. It gave an ADA accommodation review form to Sendziol, which he forwarded to Nicosia on July 26, along with a letter indicating that Yellow Freight understood Nicosia's mention of his rights under the ADA to be a request for accommodation. The form asked Nicosia to indicate his condition and whether he was requesting an accommodation, to describe the accommodation he wanted, and to identify his physicians and medical providers. The majority correctly notes that Nicosia did not fill out the form itself. But it implies that Nicosia stonewalled the company, which leaves the wrong impression about his response. Nicosia explained

that he was concerned about the fact that the form did not list time off as an accommodation, yet that was what he thought he needed. Instead of filling out the actual piece of paper, he thought it best under the circumstances to return the form along with a letter to Yellow Freight that basically answered the questions the form had posed. In the letter, he said that he was "requesting no particular considerations at this time other than the resources necessary to perform my job and reasonable accommodations necessary to monitor and maintain my health status." (Emphasis added.) He also explained that the accommodation he wanted "would include sick days, if needed[,] without being penalized." Last, he stated in the letter that he was "otherwise healthy" and that he was able "to continue working to fulfill the responsibilities and perform the duties" of a dockworker. He offered in the letter to have his physician prepare a report concerning his physical condition if Yellow Freight so desired.

Out of the 19 calendar days following the July 15 written warning, Nicosia was absent 10. The company accordingly proceeded to step 4 and on August 5, 1996, it suspended him for one day. Nicosia then sent a letter promising to "report to work every day to fulfill my duties." At the same time, his union filed a grievance challenging the suspension. On October 15, Nicosia filed his charges with the EEOC claiming that Yellow Freight had disciplined and suspended him because of his disability and that it had denied him a reasonable accommodation. He missed work five more times between November 8 and December 15. On December 16, 1996, Nicosia was terminated for excessive absenteeism, and he filed another union grievance challenging that action. Eventually the matter went to arbitration and the arbitrator ordered Nicosia reinstated in August 1997, albeit with no back pay and no benefits. Nicosia returned to work in September of that year, and as of the time this case was briefed he was still a Yellow Freight employee. After his termination, Nicosia filed a second charge of discrimination with the EEOC, in which he alleged that he had requested an accommodation, he had been denied accommodation, and he was then discharged.

II

A. Discrimination

Since the importance of attendance lies at the heart of this case, I begin with some general comments about that question. I agree entirely with the majority that, as it points out ante at 8-9, regular attendance at the job is a legitimate requirement for many positions. On the other

hand, as it concedes, this rule applies "in most instances," Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999), or "usually," Jovanovic v. In-Sink-Erator, 201 F.3d 894, 899-900 (7th Cir. 2000). The majority does not rely upon a single case for the proposition that attendance is always, invariably, as a matter of law, an essential job function. Even more importantly, I do not understand it to be adopting such a rigid and indefensible rule in the present case.

Each job carries with it different requirements, and in certain out-of-the-ordinary situations regular daily attendance may not be one of them. For example, while regular attendance may be crucial for a position as a high school teacher, see Nowak v. St. Rita High School, 142 F.3d 999 (7th Cir. 1998), it would not necessarily be important for someone who worked as a substitute teacher. In exchange for the certain salary and benefits regular teachers enjoy, substitutes may have the flexibility of declining work when they choose to do so. The same might be true of a person whose job involved piecework to be done at the home, who needed to report to the central jobsite only to drop off completed work and to pick up new projects. People who work for temporary help agencies may also not be obligated to be available at every call; their only "penalty" would be the lost income attributable to the declined work. The question before us is whether Nicosia has raised a genuine issue of material fact on the question whether Yellow Freight's regular dockworker job was (a) one of the ordinary jobs for which the company insisted on regular attendance, or (b) one of the unusual jobs for which regular attendance was not a sine qua non.

In my opinion, Nicosia has succeeded in doing so, both with respect to the existence of a defined attendance policy at Yellow Freight and with respect to the content of any such policy. It is worth remembering that this court has recognized in other cases that the existence or content of a policy is sometimes a contestable issue. See Piraino v. International Orientation Resources, Inc., 84 F.3d 270 (7th Cir. 1996), and Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035 (7th Cir. 1993). In Piraino, the employer argued that it had terminated the employee in accordance with an alleged policy governing pregnancy leave; we found that the question whether such a policy existed was disputed and could not be decided on summary judgment. 84 F.3d at 275. In Sarsha, where the employer asserted that it had fired its employee pursuant to a company policy against employee dating, not because of his age or gender, we similarly found that existence of such a policy and its content could not be assumed on

summary judgment. In this case, just as in Sarsha and Piraino, "[w]hen the existence of a uniform policy or practice is in doubt, it cannot serve as a reason for discharging [the employee]." 3 F.3d at 1040.

The majority is quite correct to note that Yellow Freight has pointed to evidence that, if believed by the jury and given the weight Yellow Freight thinks it deserves, would show that attendance was indeed a requirement of the full-time dockworker job and thus that failure to maintain regular attendance was a legitimate, nondiscriminatory reason for employee termina-tions. But Nicosia has evidence on the other side. He showed that the numbers of workers on the dock varied greatly from day to day; that workers were basically fungible with one another, so that it did not matter who was doing the loading and unloading on any particular day; that Sendziol did not follow any fixed policy other than to treat each case individually, giving very lengthy leaves to people he found deserving; and that his poor attendance was never an insurmount-able problem until the company found out he was HIV positive.

If the trier of fact believed Nicosia's evi-dence, it would find that Nicosia's attendance did not violate Yellow Freight's actual policies. Contrary to the majority's view, such a holding would be consistent with established precedent in this circuit, as well as in the others. In addition, the timing of Yellow Freight's sudden decision to escalate its response to Nicosia's problematic attendance from step 3 (where it had always stopped before) to steps 4 and 5, at the very moment when Nicosia revealed his illness--an illness that the Supreme Court has recognized is entitled to protection under the ADA, see Bragdon v. Abbott, 524 U.S. 624, 632-42 (1998)--is suspi-cious enough to indicate that Yellow Freight's stated reason for terminating him was pretextual. I would therefore hold that Nicosia is entitled to go forward with his basic claim of discrimina-tion in violation of the ADA.


   B.   Accommodation

   There also remains a question of fact regarding who-- Yellow Freight or Nicosia--was responsible for the breakdown in the accommodation process required by the ADA. Both the employer and the employee are responsible for making the accommo-dation process work. The employee has the affir-mative obligation to let the employer know that he is disabled and that he needs an accommoda-tion. Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996); see

also 42 U.S.C. sec. 12112(b)(5)(A) (stating that "the term 'discriminate' includes" "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability") (emphasis added). Once the employee provides this information, the employer has a responsibility to start the interactive process. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 563 (7th Cir. 1996); see also 29 C.F.R. sec. 1630.2(o)(3) (1999) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.").

Thus, neither the employer nor the employee can sit back and wait for the interactive process to happen. A possible interpretation of the record in this case is that Yellow Freight believes that the ADA's interactive process requires it to make only one step toward the employee, and that if the employee does not respond immediately or "correctly," then the company's responsibility ends. If that is its view, however, it is wrong. The interactive process envisioned by our cases and the EEOC (in its guidance provided appended to the ADA regulations, see 29 C.F.R. Pt. 1630, App. (1999)) requires the employer to try harder than that. It is not allowed to make one move and then call it quits. See, e.g., Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 693 (7th Cir. 1998) ("The 'reasonable accommodation' element of the Act imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working. . . . An employer must make a reasonable effort to explore the accommodation possibilities with the employee.") (citations omitted); Bultemeyer v. Fort Wayne Community Schs., 100 F.3d 1281, 1285 (7th Cir. 1996) ("The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

This record presents a genuine issue of material fact on the question of who was responsible for the breakdown in the interactive process. Neither party took a model approach to trying to figure out what reasonable accommodation(s) might have been possible. One obvious suggestion Yellow Freight never made was to return Nicosia to the status of "casual" worker, which everyone seems to concede would have both permitted Nicosia the attendance flexibility his illness required, while giving Yellow Freight the reliability it

needed from its regular workers. I need not decide whether this would have been a proper accommodation or not, but the silence on this and other possible arrangements is deafening. Nicosia explained his problems to Yellow Freight in his letter and he told them what he needed; Yellow Freight charged ahead with its disciplinary process without ever thinking about what might have served both parties' interests in a manner acceptable to the ADA. On this record, once again it is the trier of fact who should have been permitted to decide who dropped the ball. See Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 634 (7th Cir. 1998) (holding summary judgment inappropriate where there was a genuine issue of material fact as to who was responsible for the breakdown in the interactive process); Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 677 (7th Cir. 1998) (same).

III

Because genuine issues of material fact are present in this record, I would Reverse the district court's summary judgment for Yellow Freight on the ADA discrimination claim and the ADA accommodation claim, and I would Remand those two parts of the case for further proceedings. To that extent, I respectfully dissent.