**Sharon D. SERMONS, Plaintiff,**

v.

**FLEETWOOD HOMES OF GEORGIA, Defendant.**

**No. CIV.A.CV500–117.**

United States District Court, S.D. Georgia, Waycross Division.

Sept. 6, 2002.

Martha F. Dekle, Brunswick, GA, for plaintiff.

Charles A. Hawkins, Jennifer R. Williams, Laura D. Windsor, Troutman Sanders, LLP, Atlanta, GA, James B. Durham, William M. McHugh, Durham, McHugh & Duncan, PC, Brunswick, GA, for defendant.

## ORDER

MOORE, District Judge.

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 28). After careful consideration, the Court finds that Defendant's motion must be **GRANTED**.

## BACKGROUND

The facts of this case are largely undisputed.[1] Plaintiff Sharon Sermons began working for Defendant Fleetwood Homes of Georgia in Alma, Georgia on September 17, 1997. Defendant's business involves producing manufactured homes. Originally, Plaintiff worked as a temporary employee, assigned to work as a molder in the Final Finish Department. In October 1997, she was reassigned to the position of access panel installer in Final Finish. On November 17, 1997, Defendant hired Plaintiff as a full-time employee.

As an access panel installer, Plaintiff performed various duties, including installing access panels, shower doors, floor vents, duct vents, and sheetrock in manufactured homes. All of Plaintiff's duties required her to use a tool box and all involved heavy lifting. She was required to lift objects weighing from at least ten to more than twenty-seven pounds.

On October 11, 1998, Plaintiff learned she was five weeks pregnant. A couple of days later, she informed her foreperson, Joey Mullins, of her pregnancy. She did not tell any other managers. Plaintiff suggested to Mr. Mullins that because she was pregnant he should consider giving her a different job than access panel installer. For instance, Defendant had hired a new employee to do bottom boarding, and that employee was scheduled to start work the following Monday. Plaintiff suggested that she be given that job instead. Apparently, however, on October 19, 1998, the new employee, Sherry Simmons, started her job doing bottom boarding, and Plaintiff continued to do her regular job as access panel installer.

On October 26, 1998, Plaintiff visited her doctor. He told her that, because of her pregnancy, she should not lift anything over ten to fifteen pounds. He also wrote her an excuse slip to give her employer. With those restrictions on her lifting, Plaintiff would not be able to perform the regular duties of an access panel installer.[2]

The morning of October 27, 1998, Plaintiff gave her doctor's excuse slip to Ron Burkett, the Assistant Production Manager.[3] Mr. Burkett then gave the note to Barry Wagoner, Production Manager. At some point, Mr. Burkett told Plaintiff that he needed to call the home office to determine what the company's guidelines were for managing the work restrictions of pregnant employees. Mr. Wagoner contacted Defendant's Eastern Region Hu-

---

1. This account is, for the most part, based on the admitted facts from Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Tried. Other facts are taken from the exhibits and Plaintiff's brief.

2. Her restrictions also prevented her from doing all the tasks of a bottom boarder, since

that job required the employee to use a "creeper," which weighed at least thirty pounds.

3. In the managerial hierarchy at Fleetwood, Mr. Mullins was Plaintiff's first-line supervisor. Mr. Mullins reported to Mr. Burkett, and Mr. Burkett reported to Mr. Wagoner.

man Resources Manager to discuss all of the relevant company policies.

Later in the morning on October 27, 1998, Mr. Wagoner told Plaintiff that he would not be able to create a new position for her or train her for a different job. He did instruct Mr. Burkett to weigh Plaintiff's equipment to see if anything she worked with weighed over fifteen pounds. The weighing revealed that several of the objects Plaintiff was required to lift exceeded her lifting restrictions.

Mr. Burkett told Plaintiff to confirm with her doctor that these restrictions were necessary. The next day, Plaintiff brought Mr. Burkett a letter in which the doctor reiterated the restrictions and emphasized that there could be no exceptions. Mr. Burkett then informed Plaintiff that he believed she would have to take medical leave, but he would confirm his belief with Human Resources. In the meantime, he assigned two employees to assist Plaintiff in the lifting duties of her position.

Plaintiff wanted to be reassigned to another job that would meet her restrictions. For instance, in her deposition she states that she could wipe walls, putty holes, or clean. However, Plaintiff admits that she did not know of any jobs doing those tasks that were available. Mr. Burkett and Mr.

Wagoner both testified that no jobs that met Plaintiff's restrictions were open.[4] (Burkett Depo. at 36; Wagoner Depo. at 45). In fact, most jobs in the Final Finish Department were labor intensive.

Either October 28, 1998 or the next morning, Mr. Wagoner talked to Mr. Frank Hardy in the regional human resources office. Mr. Hardy informed Mr. Wagoner that, pursuant to company policy, Plaintiff's only option was to take a medical leave of absence. On October 29, 1998, Plaintiff met with Mr. Wagoner. He told her that no positions were available that met her restrictions. He also told her that he could not give her a light-duty assignment because those were only available for employees who had on-the-job injuries.

Plaintiff refused to take medical leave and demanded that Mr. Wagoner either give her a light-duty assignment or terminate her employment. Mr. Wagoner decided to fire Plaintiff. He told her, however, that she could return to Fleetwood if her restrictions changed or if a job that fit Plaintiff's restrictions became available. Although Plaintiff admits she could have returned to Fleetwood after giving birth, she chose not to.

Defendant asserts that, had Plaintiff accepted medical leave, she would have re-

---

**4.** In her response to Defendant's statement of undisputed facts, Plaintiff admits that she did not know of any openings in the jobs she felt she could do, but she denies Defendant's statement that "[t]here were no positions available at the Plant that Plaintiff could perform given her medical restrictions." (Pla. Resp. to Def. Stat. of Mat. Facts at ¶ IV). In support of her denial, Plaintiff cites to nine exhibits without referencing any specific page or paragraph numbers within those exhibits. Still, those exhibits appear to go towards a different issue, that is, whether other employees have been given light-duty assignments in the past. The exhibits do not seem to identify any job that was actually available at the time *Plaintiff* was given her work restrictions.

In her response brief, Plaintiff does offer specific citations to Mr. Swain's deposition, claiming that his testimony shows that "[t]here were lighter jobs available to which Mrs. Sermons could have been assigned when she learned she was pregnant." (Pla. Resp. at 9). However, the portions of Mr. Swain's testimony to which she cites contains only Mr. Swain's personal opinions about whether Defendant could have given Plaintiff Ms. Simmons' position or given her light-duty work. His testimony does not show that any positions that met Plaintiff's job restrictions were available. Accordingly, despite Plaintiff's saying that this fact is denied, she has not offered anything other than speculation to dispute the proffered fact.

ceived disability pay and would also have kept her medical coverage.[5] (Wagoner Depo. at 52, 55–56). However, it does not appear from the record that Mr. Wagoner explained to Plaintiff what a medical leave of absence would have entailed.

Defendant asserts that sixty-five individuals were given light-duty assignments at the Alma facility in 1998, 1999, and 2000. Defendant states that all these employees were given light-duty work because of on-the-job injuries. With the exception of one employee named for the year 1999, Mr. Robert Swain, Plaintiff admits that those employees received light-duty assignments and that those employees had work-related injuries. However, she asserts that in 1991, 1993, 1994, 1995, four different employees were given light-duty assignments even though they had not suffered on-the-job injuries. She also argues that in 1999, Robert Swain received light duty for an illness and Jason Taggart received light duty after a car accident, even though neither disability was work-related. She also claims that in the period since 1996, Donna Hyers was given light-duty work after undergoing surgery unrelated to any workplace injury.

Plaintiff filed suit on December 15, 2000. In her amended complaint, Plaintiff alleges pregnancy discrimination, damage to her reputation, and intentional infliction of emotional distress. On February 20, 2002, Defendant filed a motion for summary judgment asserting that all of Plaintiff's claims must be dismissed. Plaintiff filed a response to Defendant's motion on March 22, 2002, and Defendant filed a reply a few days later.

## ANALYSIS

### I. *Standard of review*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order

---

**5.** In her response to Defendant's statement of undisputed facts, Plaintiff denies that she would have received disability pay or medical benefits. In support, she cites to Plaintiff's and Mr. Wagoner's depositions. However, the pages cited from Plaintiff's deposition do not discuss medical leave at all. Hence, the Court cannot determine the relevance of those pages to the fact allegedly in dispute. The portions of Mr. Wagoner's testimony to which Plaintiff cites show that she did not qualify for Family Medical Leave or a pregnancy leave of absence, but Defendant does not assert that she was qualified for either. As is clear from the Employee Handbook, a medical leave of absence is an entirely different type of leave. (Pla. Exh. J at 5–6). Apparently, it was available after an employee had been with Fleetwood for sixty days. (Def. Exh. 15 to Pla. Depo. at 2).

Relatedly, in her response brief, Plaintiff states that Mr. Burkett "knew that an employee must be with the company for a year before [a medical leave of absence] could be utilized." (Pla. Resp. at 4). However, the pages of Mr. Burkett's deposition to which Plaintiff cites reveal that he was very unfamiliar with the details of Defendant's different leave plans or the benefits attached to them. Hence, he is clearly not qualified to discuss the particular features of the separate plans. More importantly, Plaintiff does not allege that Mr. Burkett told her she did not qualify for leave because she had not been an employee a full year. The fact that he thought an employee had to work a year before being qualified to take medical leave does not create a material dispute on this point.

For these reasons, the cited testimony does not show a material dispute as to whether Plaintiff was entitled to a medical leave of absence. Hence, except for saying Defendant's statement is denied, Plaintiff does not offer any evidence suggesting that a jury could find Plaintiff was not entitled to receive disability pay or medical benefits.

to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.,* 932 F.2d 1384, 1387–88 (11th Cir.1991). The substantive law governing the action determines whether an element is essential. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. However, if the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the court must enter summary judgment in the moving party's favor. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Johns v. Jarrard,* 927 F.2d 551, 556 (11th Cir.1991).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l. Corp. v. First Am. Nat'l. Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *See, e.g., Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted). In light of this standard, the Court will now address each of Defendant's arguments for summary judgment.

## II. *Pregnancy discrimination*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* prohibits an employer from refusing to hire, discharging, or otherwise discriminating against

any individual "because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a) (1994). In 1978, Congress passed the Pregnancy Discrimination Act ("PDA") to clarify that discrimination "because of sex" or "on the basis of sex" includes discrimination because of or on the basis of pregnancy. 42 U.S.C. § 2000e(k). This means that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to do work . . . ." *Id.*

To prove her Title VII claim, Plaintiff may present either direct or circumstantial evidence of pregnancy discrimination. In this case, Plaintiff does not assert that she is using direct evidence to prove her claim. Instead, Plaintiff relies on circumstantial evidence. When a plaintiff relies on circumstantial evidence, the three-tiered analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green* applies. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that analysis, a plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. Then, if the plaintiff satisfies this requirement, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory conduct. *Id.* Finally, if the defendant meets its burden, the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reasons are not true and are instead merely pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825. "Despite the shifting burdens of proof, the ultimate burden of persuasion, remains at all times with the plaintiff." *Polote Corp. v. Metric Constructors, Inc.,* 880 F.Supp. 836, 843 (S.D.Ga.1995) (citing *Texas Dept.*

*of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). Where the evidence, taken as a whole, is such that a jury could not find that the plaintiff was a victim of discrimination, summary judgment should be granted. *Sample v. Schuller International, Inc.,* 836 F.Supp. 876, 882 (S.D.Ga. 1993).

## A. *Prima facie case*

The first step towards deciding if a plaintiff has presented sufficient circumstantial evidence to go to trial is considering whether she has made a prima facie case of pregnancy discrimination. To establish her prima facie case, a plaintiff must prove four things: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position; (3) she suffered an adverse effect on her employment; and (4) she suffered from differential application of work or disciplinary rules. *Armstrong v. Flowers Hospital, Inc.,* 33 F.3d 1308, 1314 (11th Cir.1994). In this case, Defendant does not dispute that Plaintiff is a member of a protected group. However, Defendant does dispute that Plaintiff was qualified for the position, that she suffered from an adverse effect on her employment, or that she was treated differently in the application of Defendant's work rules.

In response, Plaintiff's only explicit argument as to her prima facie case is that she did suffer an adverse employment action. Her other arguments are framed in terms of pretext, but Plaintiff nevertheless contests Defendant's assertion that she did not suffer from differential application of Defendant's rules. She also implicitly claims that Defendant's arguments about her qualifications are insufficient. In the discussion below, the Court will first address whether Plaintiff suffered an adverse action. Then, the Court will simulta-

neously address whether Plaintiff was qualified and whether she was subjected to differential application of Defendant's rules.

### 1. *Adverse effect*

Defendant argues that Plaintiff did not suffer an adverse effect on her position because she was merely asked to take medical leave. Defendant asserts that Plaintiff unreasonably refused to take that leave and demanded that she be given special accommodation or be terminated. In response, Plaintiff maintains that because she was terminated, she suffered an adverse employment action.[6]

Courts have explained that an adverse employment action is an ultimate employment decision, such as a discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir.2000) (citation omitted). In this case, according to Plaintiff's allegations, Plaintiff was told she could either take medical leave or be terminated. Termination is clearly an ultimate employment decision. While requiring an employee to take medical leave presents a more complicated question, for purposes of this motion, the Court finds that demanding an employee take leave for an extended amount of time probably alters her com-

pensation, benefits, and other conditions and privileges of employment. Accordingly, the Court will assume for now that Plaintiff could convince a reasonable jury that she suffered an adverse effect on her employment.

### 2. *Qualified for the position and differential application of work rules*

█ Turning to the other two disputed elements of Plaintiff's prima facie case, Defendant argues that Plaintiff cannot show she was qualified. Defendant contends that Plaintiff could not perform her job or most other positions in the department because of the weight restrictions given to her by her doctor. Defendant also asserts that Plaintiff was not qualified to be offered light-duty tasks. Defendant asserts that light-duty work was only available for employees who suffered work-related injuries, and Plaintiff's medical restrictions resulting from her pregnancy did not satisfy that requirement. Defendant argues that Plaintiff cannot show she suffered a differential application of the rules because Defendant's light-duty policy is applied uniformly, whatever the non-work-related disability.

In her discussion of her prima facie case, Plaintiff does not directly address whether she was qualified or whether she suffered differential application of Defendant's rules. However, in her arguments overall, she does dispute that a light-duty policy existed and that the alleged policy was applied uniformly. Accordingly, she im-

---

**6.** In the same portion of her response brief, Plaintiff asserts that she suffered an adverse action because she was told "she was not eligible for leave under the [Family Medical Leave Act], and that she was not eligible for other leave provided for by company policies, because she had not been employed by the company for one year." (Pla. Resp. at 10). Plaintiff then cites five exhibits in support of her statement. (Id.) However, Plaintiff does

not dispute that she did not qualify for Family Medical Leave, and she has not explained why her ineligibility is evidence of an adverse action. Furthermore, the Court has reviewed the cited exhibits and has found no evidence that Plaintiff was actually told she was not eligible for other leave. To the contrary, the exhibits reflect that Plaintiff was repeatedly offered medical leave, which she consistently refused.

plicitly contests Defendant's arguments about her not being qualified for light duty and her not suffering a differential application of company rules. In the analysis below, the Court will address the prima facie elements of qualification and differential application of rules together because both issues depend on whether Defendant had a light-duty policy and whether that policy was uniformly applied.

■ Before discussing Defendant's alleged policy in this case, the Court must explain in more detail how the existence of a light-duty policy is effected by the PDA. The PDA does not require an employer to provide special accommodations to its employees. Instead, the PDA only ensures that pregnant employees are given the same opportunities and benefits as non-pregnant employees who are similarly limited in their ability to work. *Byrd v. Lakeshore Hospital,* 30 F.3d 1380, 1382 (11th Cir.1994) ("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded non-pregnant temporarily disabled employees."). If an employee's pregnancy actually prevents her from fulfilling the duties of her position, her employer is not obligated to give her preferential treatment. *Spivey v. Beverly Enterprises, Inc.,* 196 F.3d 1309, 1312 (11th Cir.1999) ("The PDA does not require that employers give preferential treatment to pregnant employees."). In other words, her employer is not required to accommodate her if the employer would not accommodate non-pregnant employees in a comparable situation. *Armstrong,* 33 F.3d at 1317 ("Statements in the legislative history make it clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees."); *Byrd,* 30 F.3d at 1382 n. 3 (reviewing legislative history and finding that the

PDA does not require employers to provide benefits to pregnant employees that would not be provided to others). Accordingly, if an employer only gives special accommodations to employees hurt while on-the-job, and not employees hurt or temporarily disabled for other reasons, the employer does not need to furnish those accommodations to its pregnant employees. *Spivey,* 196 F.3d at 1313 ("We therefore hold that an employer does not violate the PDA when it offers modified duty solely to employees who are injured on the job and not to employees who suffer from a non-occupational injury. Of course, pregnant employees must be treated the same as every other employee with a non-occupational injury.").

In this case, Defendant argues that its policy has always been to give light-duty assignments only to workers who suffered on-the-job injuries. However, Defendant admits that before 1996, some workers who did not suffer job-related injuries were nevertheless accommodated. Still, Defendant asserts that in 1996, its policy was clearly communicated by its home office to management at the Alma plant. From that point on, maintains Defendant, no' workers who had work restrictions caused by injuries or temporary disabilities that were not work-related were to be given light-duty assignments. Instead, such employees either had to perform their jobs, seek a different available job of which they were capable, or take a medical leave of absence.

In response, Plaintiff does not dispute that if Defendant had such a policy and if that policy was uniformly enforced, she would not have been entitled to light duty. However, she argues that because the alleged light-duty policy was not written down and distributed to employees, no light-duty policy existed. She also asserts

that the purported policy was not uniformly applied.

Having carefully reviewed the evidence and the parties' arguments, the Court finds that Plaintiff has failed to show there is a material dispute as to whether Defendant had a light-duty policy. Defendants have offered testimony showing that in 1996, Defendant's corporate office told Mr. Wagoner that only employees who were injured while working could be given light-duty assignments. Mr. Wagoner and Mr. Burkett both testified that such a policy was in place.[7] Pursuant to the light-duty policy at least sixty-five employees with work-related injuries were given light-duty work. In addition, Mr. Burkett swore in his affidavit that, pursuant to the company's policy, he "routinely" denies light-duty requests, denying approximately five or six requests each year. (Burkett Aff. at ¶ 15). Plaintiff has not offered any evidence that actually contradicts any of these facts.

As further support for the existence of its policy, Defendant has introduced into evidence a document purporting to show its "Modified Work Process." (Def. Exh. 15 to Pla. Depo. at 1). This documents states, "The manufacturing facility will provide modified work assignment's [sic] for our Associates injured while in the course of employment." (Id.) While the document does not explicitly say that light duty is not available to employees without work-related injuries, the next page of the same exhibit provides that leaves of absence are available for associates "unable

to perform regular work duties because of illness or injury unrelated to the job." (Id. at 2). Although the Court cannot say that these documents are an undisputable written record of the policy Mr. Wagoner and Mr. Burkett claim to have been following at the time of Plaintiff's termination, Plaintiff does not dispute either the authenticity or meaning of these documents.

██ Plaintiff does argue that Defendant did not distribute this policy to its employees, but that fact does not change the result. Plaintiff has offered no authority that demonstrates if an employer does not distribute a policy to its employees, the question of the existence of the policy must reach the jury. Plaintiff does cite two Seventh Circuit cases that say, under some circumstances, the absence of the written policy may create a question for the jury as to whether the policy actually exists. *Piraino v. International Orientation Resources, Inc.*, 84 F.3d 270, 274–75 (7th Cir.1996); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1040 (7th Cir.1993). However, in both those cases, Plaintiff's offered much more than the absence of a written policy to show the presence of a jury question.

For instance, in *Piraino*, the plaintiff presented testimony from the president of the company, the director of human resources, and the director of training, all of whom suggested, not that a uniform policy about leave existed, but that the company's response to the plaintiff's pregnancy would be "ad hoc." 84 F.3d at 274–75. Based on

---

7. Plaintiff claims that one piece of evidence that demonstrates no such policy existed is Mr. Burkett's testimony. Specifically, Plaintiff argues that Mr. Burkett admitted in his deposition that he has never seen the policy in writing. Plaintiff also contends that Mr. Burkett testified that Mr. Wagoner did not tell Mr. Burkett about the policy until two days before his deposition in this case. However, Plaintiff has not explained why Mr. Burkett's having not seen the policy in writing means that such a policy did not exist. Moreover, despite Plaintiff's characterization of his testimony, Mr. Burkett did not say that he had never heard of the policy until two days before the deposition. Instead, Mr. Burkett said that he and Mr. Wagoner had talked about the policy two days before his testimony. He also said "he has mentioned it in the past before though." (Burkett Depo. at 20).

this fact, and other evidence about the course of events and statements made to the plaintiff, the court found that a reasonable jury could believe the defendant had concocted its "policy" to discriminate against the plaintiff. *Id.* at 275.

The decision in *Sarsha* is similar. There, the employee presented evidence that, even though his employer claimed there was a policy against employee dating, no such policy existed. For example, despite his being a manager, the plaintiff claimed he had never heard of such a policy. *Sarsha,* 3 F.3d at 1040. Also, he had openly dated and married his second wife while working for the defendant, and the defendant had even thrown a party for the plaintiff and his wife before their wedding. *Id.* Furthermore, the testimony of the company's regional director suggested that, under some circumstances, dating might be permissible. *Id.* In light of this evidence, the Seventh Circuit found that a material dispute remained as to whether the defendant had a policy against employee dating. *Id.*

The Court finds that in neither of these cases did the Seventh Circuit create a per se rule about the ability of a plaintiff to reach a jury when employees are not given a written copy of a purported policy. Instead, the Seventh Circuit found that when no written policy is in evidence, a plaintiff may be able to reach a jury if other evidence suggests that the policy did not actually exist. Hence, under those cases, only if Plaintiff offers more than the failure of Defendant to distribute a written record of the policy, might Plaintiff have demonstrated a question for trial.

Plaintiff argues that she has more than the absence of a written policy to prove her claim. Specifically, she asserts that she has evidence showing that some employees were accommodated in contravention of the purported policy. Because the alleged policy was not applied uniformly, Plaintiff seems to argue either that the policy did not exist or that an exception could have been made in her case.

The Court finds that Plaintiff's allegations that other employees were treated more favorably are not sufficient to establish her prima facie case. First, as will be discussed later in this order, Plaintiff has not produced adequate evidence to show that employees without work-related injuries were, in fact, given light-duty accommodations. Most of the employees Plaintiff names in support of her allegations were given their modified job assignments before 1996,[8] and the rest do not appear to have received modified assignments for non-work-related injuries at all. In addition, even if such accommodations did occur, Plaintiff does not claim that other employees with job restrictions were accommodated despite the fact that no appropriate positions were available.

 Second, even if Plaintiff could show that employees were accommodated contrary to the light-duty policy, Plaintiff offers only three incidents since 1996 to do so. The undisputed evidence reveals that of sixty-five employees identified by Defendant as having been given light-duty assignments, all of them had work-related injuries. Moreover, Mr. Burkett swears in an affidavit that every year he receives as many as five or six requests for light duty from employees without on-the-job inju-

8. The Court finds that only the period after 1996 is relevant for purposes of this discussion. Defendant docs not deny that, before Mr. Wagoner was told by someone from the corporate office in 1996 to enforce the described light-duty policy, exceptions were

made. However, the incidents in this case occurred in 1998. Hence, Plaintiff must show that after 1996, when Defendant allegedly changed its policy, the purported policy was not actually put into effect or was not applied uniformly.

ries, and he further swears that he denies all such requests.[9] Hence, the allegation that on, at most, three occasions over the course of several years, someone without a workplace injury received a light-duty assignment is not enough for a reasonable jury to decide that the light-duty policy did not exist or that Plaintiff was subjected to differential application of it.

As for whether Plaintiff was qualified for a position other than light duty, Plaintiff has not presented sufficient evidence to show that she was. She admits that she could not perform all of her own job functions by herself. Hence, she was not qualified to do the access panel installer job. Moreover, Plaintiff has not identified any other jobs that met her lifting restrictions and were available.[10] Accordingly, Plaintiff cannot show that she was qualified for any jobs.

Because she has not shown that a reasonable jury could find she was qualified or find that she was treated differently from similarly-situated non-pregnant employees, Plaintiff has not presented sufficient evidence to prove her prima facie case. Accordingly, summary judgment is appropriate.

## B. *Legitimate, nondiscriminatory reason*

Because the Court has ruled that Plaintiff has not established her prima facie

case, the Court does not need to decide whether Defendant has offered legitimate, nondiscriminatory reasons for its decision or whether Plaintiff can prove pretext. However, in an abundance of caution, the Court will address these issues. In doing so, the Court will assume, for purposes of this discussion only, that Plaintiff can show she was treated differently from non-pregnant employees and that she was qualified to do some type of work.

■■■ In showing that it had a legitimate, nondiscriminatory reason for its treatment of a plaintiff, a defendant's burden is "exceedingly light." *Perryman v. Johnson Products Co. Inc.*, 698 F.2d 1138, 1142 (11th Cir.1983) (citing *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094). The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. As long as the defendant articulates its reason with some specificity so that the plaintiff has "a full and fair opportunity to demonstrate pretext," the defendant's burden has been met. *Id.* at 255–56, 101 S.Ct. at 1095.

■■■ In this case, Defendant argues that it denied Plaintiff a light-duty assignment because it had a policy of only giving light-

---

9. Mr. Burkett asserts that he never granted any of these requests. (Def. Exh. G at ¶ 15). He also asserts that he has no knowledge of any employees without work-related injuries having received light-duty assignments after 1996. (Id. at ¶ 19).

10. In her deposition, Plaintiff claims that she should have been given Sherry Simmons' job. As mentioned in the background facts, Ms. Simmons started as a bottom boarder a few days after Plaintiff had informed her supervisor, Mr. Mullins, that she would like a different position due to her pregnancy. However, in her brief, Plaintiff does not mention Ms.

Simmons, much less explain whether Ms. Simmons had already been hired at the time of Plaintiff's request, or whether Ms. Simmons was qualified to switch to the access panel installer job. Moreover, although Plaintiff does not discuss whether she would have been able to perform other functions of Ms. Simmons' job, Plaintiff admits that bottom boarding requires use of a thirty-pound "creeper." Accordingly, the Court will not assume that Plaintiff believes Defendant's failure to put her in Ms. Simmons' position, either before or after Ms. Simmons' started work, supports her prima facie case.

duty assignments to employees suffering from on-the-job injuries. Defendant asserts that this is nondiscriminatory because, according to the Eleventh Circuit, a Defendant does not have to provide special accommodations to a pregnant employee. *Spivey*, 196 F.3d at 1312.

The Court finds that with this explanation, Defendant has met its light burden of producing a legitimate, nondiscriminatory reason for its actions. As a result, the Court will now consider whether Plaintiff has produced sufficient evidence to show that Defendant was not actually motivated by this rationale.

### C. *Pretext*

Once a defendant offers a legitimate, nondiscriminatory reason for its actions, the plaintiff must attack that reason "head on and rebut it" so as to show that the reason is really pretext for discrimination. *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir.2000). The plaintiff must offer evidence that "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) (quoting *Cooper–Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir.1994)), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In other words, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). An explanation is unworthy of credence if the plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the explanation that a reasonable jury could not believe it. *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (citations omitted)). Either direct evidence or "circumstantial evidence in the form of comparative or statistical evidence" can be used to meet the plaintiff's burden. *Woody v. St. Clair County Commission*, 885 F.2d 1557, 1560 (11th Cir.1989) (citing *Miles v. M.N.C. Corporation*, 750 F.2d 867, 870 (11th Cir.1985)). Now, the Court will consider whether Plaintiff has offered sufficient evidence to persuade a reasonable jury that Defendant was motivated by discrimination, rather than its alleged obligation to follow its light-duty policy, when it refused to change Plaintiff's job duties.

### 1. *The policy and exceptions*

One of the reasons Plaintiff offers for why Defendant's explanation cannot be believed is that Defendant's policy was not distributed to employees in writing. However, as discussed earlier, the Court does not find that Defendant must have distributed written copies of the policy to its employees to show that it was actually following that policy when it acted. Defendant has offered sufficient oral evidence as to the existence of a light-duty policy after 1996, and Defendant has supplemented that evidence with company documents that further support Defendant's assertions. Plaintiff has provided no meaningful evidence contradicting either the oral or written evidence. Accordingly, Plaintiff's argument that no written policy was distributed to employees is inadequate to create a jury issue on the question of pretext.

The Court now turns to Plaintiff's argument that the alleged policy was not always enforced, therefore showing that De-

fendant used the policy as an excuse to discriminate against Plaintiff because of her pregnancy. In support of this position, Plaintiff claims that several employees who did not have work-related injuries were given lighter duties. Defendant denies that the evidence supports Plaintiff's allegations. The Court will now discuss Plaintiff's proffered evidence and argument regarding three of those employees, Robert Swain, Jason Taggart, and Donna Hyers.[11]

### a. Robert Swain

▮ Plaintiff claims that in late 1999, Mr. Swain was twice given light-duty work to accommodate a serious illness unrelated to his job. In support, Plaintiff offers an affidavit from Mr. Swain. In the affidavit, Mr. Swain swears that he was diagnosed with a serious illness for which he was given light-duty work from November 29, 1999 to December 1, 1999 and from December 8, 1999 to December 20, 1999.[12]

In its reply brief, Defendant argues that Mr. Swain's affidavit asserting that he received light duty for a non-work-related illness should be discounted. First, Defendant asserts that the affidavit directly contradicts prior deposition testimony without explaining the clear contradiction. Furthermore, Defendant contends that the documents in Mr. Swain's file do not support his sudden change in testimony.

The Court agrees with Defendant that Mr. Swain's unequivocal deposition testimony is that he received a light-duty assignment only once, when he injured his back while at work at Fleetwood. (Swain Depo. at 13, 14, 38). His affidavit directly contradicts that testimony, but neither Plaintiff nor Mr. Swain explain why the Court should allow the later statements to be presented to a jury. Accordingly, the Court finds that Mr. Swain's affidavit should be disregarded. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir.1987) ("The law in this circuit is that a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction ... When this occurs, the court may disregard the affidavit as a sham.") (citation omitted).

Furthermore, Mr. Swain's statements that his doctor twice informed Defendant in late 1999 that Mr. Swain should be given light-duty work are not supported by any documentation.[13] Instead, the note

---

**11.** As mentioned in footnote 8, *supra*, the Court will not consider evidence about employees who were allegedly accommodated before 1996. Plaintiff has not explained why the period prior to 1996 is relevant when Defendant admits that, at that time, before Plaintiff was even hired, employees without work-related injuries were sometimes accommodated with light-duty assignments. Given the admission, the earlier incidents do not show that Defendant's proffered legitimate, nondiscriminatory reason for applying the policy years later is pretext.

**12.** Plaintiff filed her response brief on March 22, 2002, but did not file Mr. Swain's affidavit until April 2, 2002. Plaintiff offers no explanation for the delay. Accordingly, Defendant argues that the affidavit should be disregard-

ed as untimely. However, even though the affidavit was clearly untimely, because it will be disregarded for other reasons, the Court will not omit the affidavit from consideration at this time.

**13.** One document that was apparently inserted in Mr. Swain's file by mistake does include an instruction from a doctor saying that the doctor's patient, Susan Lane, could return to light-duty work as of December 7, 1999. However, if either Plaintiff or Mr. Swain is relying on this document as proof of Mr. Swain's having been given work restrictions, neither explains why Susan Lane rather than Robert Swain is the patient named on the form. Moreover, the form clearly states that Ms. Lane suffered a workplace injury, so even

dated December 1, 1999 from Mr. Swain's doctor to Defendant lists no restrictions on Mr. Swain's ability to work. (Pla. Exh. S at 4). The other documents in evidence reflect only that Mr. Swain took medical leave twice during the relevant period. (Pla. Exh. S at 3, 5, 6, and 7).

Moreover, even if Mr. Swain's sudden revision of the facts were allowed to reach a jury, a reasonable jury would not find his allegations sufficient to show pretext. Mr. Swain does not allege that either Mr. Burkett or Mr. Wagoner were personally involved in the decision to assign Mr. Swain light-duty work, much less that they did so despite knowing that Mr. Swain was not suffering from a work-related injury. In addition, even if Mr. Swain was accommodated, given that approximately sixty-five employees who received light-duty work in 1998, 1999, and 2000 had work-related injuries, and further given that Mr. Burkett denied requests for light-duty work from employees without on-the-job injuries five or six times every year, Mr. Swain's alleged exceptional treatment, either alone or with Plaintiff's other purported evidence, is not enough to show that when Plaintiff was denied light-duty work, this was done because she was pregnant and not because of the company policy.

Accordingly, because Mr. Swain's later affidavit cannot be credited, and also because even if it were credited it does not prove pretext, Plaintiff's evidence regarding Mr. Swain does not create a material dispute for the jury.

b. *Jason Taggart*

■ Plaintiff also offers the experiences of Jason Taggart as evidence of pretext. Plaintiff contends that even though Mr. Taggart had been injured in a car accident unrelated to work, he was assigned to light-duty work in 1999. In response, Defendant asserts that Mr. Taggart's testimony shows that he actually did not receive light-duty work. In addition, Defendant argues that even if his work reassignments could be construed as "light duty," the evidence does not suggest that Mr. Burkett knew Mr. Taggart was being accommodated because of his injury. At most, maintains Defendant, the reassignment to light-duty work was a mistake by Mr. Taggart's supervisor, and it does not show that Plaintiff was terminated because of discrimination rather than because of the company's policy.

To explain whether evidence about Mr. Taggart is evidence of pretext, the Court will describe two affidavits signed by Mr. Taggart. The first affidavit was signed on January 16, 2002. (Pla.Exh. T). In it, Mr. Taggart swears that he cracked a vertebra in a car accident in 1998. (Id. at ¶¶ 4, 5, 8). He asserts that when he returned to work after a few days off, he was given a different job, bottom boarding. (Id. at ¶ 10). He further states that when he told his supervisors that his neck was bothering him in his new job, he was reassigned even lighter duties, specifically, puttying. (Id.) Mr. Taggart then claims that he continued puttying for two or four more weeks before he was returned to his original position. (Id. at ¶ 11). Nowhere in this first affidavit does Mr. Taggart state that he complained about his neck pain to Mr. Burkett or Mr. Wagoner before being reassigned. He also does not assert that either the bottom boarding or puttying positions had to be created or made available so they could be assigned to Mr. Taggart.

Mr. Taggart's second affidavit was signed on February 6, 2002. (Def.Exh. F). In this declaration, Mr. Taggart references his earlier affidavit and says that after he

---

if Defendant did assign her to light-duty work,

its doing so did not contravene its policy.

signed the first one, he reviewed his personnel file and realized he needed to clarify his testimony. (Id. at ¶¶ 2, 3). For instance, Mr. Taggart clarifies that his first job was as a molder.[14] (Id. at ¶ 7). He also provides more detail about his car accident and the subsequent events, explaining that his car accident occurred on or about December 26, 1998, after which his doctor told him he could not return to work until approximately January 19, 1999. (Id. at ¶¶ 8, 10). Mr. Taggart states that he took medical leave. (Id. at ¶ 10).

According to the second affidavit, Mr. Taggart returned to work on January 18, 1999 with a note from his doctor fully releasing him to work. (Id. at ¶ 12). Mr. Taggart then reiterates that soon after his return, he told Mr. Mullins his neck was hurting. (Id. at ¶ 14). At that point, Mr. Taggart declares that Mr. Mullins informed him he would be moved to bottom boarding since Defendant had hired another molder while Mr. Taggart was on leave. (Id.) Mr. Taggart explicitly states that he has no knowledge about whether Mr. Burkett or Mr. Wagoner knew Mr. Mullins referred to bottom boarding as "light-duty" work. (Id. at ¶ 15). As for whether the later switch to puttying was also an accommodation, Mr. Taggart states that change occurred several months after his accident and had nothing to do with his injuries. (Id. at ¶ 17). Instead, he says that, at that time, Fleetwood was short on putty workers. (Id.) He characterizes his time doing putty work as "brief." (Id. at ¶ 19).

The Court finds that, unlike Mr. Swain's second affidavit, Mr. Taggart's affidavit does not need to be disregarded. Mr. Taggart explains why he is writing a sec-ond affidavit and why it is not entirely consistent with the first. Also, Plaintiff does not argue that the second affidavit should be disregarded for any reason. Accordingly, the Court finds that the second affidavit will be considered as evidence. The Court also finds that its contents are undisputed. .

Now considering the overall effect of Mr. Taggart's testimony, the Court finds that it could not persuade a reasonable jury that Defendant terminated Plaintiff because of her pregnancy rather than because of its asserted light-duty policy. Even if Mr. Mullins assigned Mr. Taggart to bottom boarding in an attempt to accommodate Mr. Taggart's injury, Mr. Taggart's testimony does not suggest that the bottom boarding position was unavailable when it was given to him. Also, his testimony does not suggest that the undisputed decision makers in this case, Mr. Burkett or Mr. Wagoner had any knowledge that, for Mr. Mullins, Mr. Taggart's injury was a factor in that reassignment, if it was a consideration at all. Furthermore, Mr. Taggart explicitly states that the puttying assignment was not an accommodation for him, but a necessity given a shortage of putty workers. Hence, Mr. Taggart's testimony does not suggest that when Plaintiff was denied a position or assignment that met her restrictions, Defendant was discriminating against her rather than acting pursuant to policy.

This conclusion is supported by other evidence. For instance, Defendant offers an affidavit from Mr. Burkett declaring that when Mr. Taggart was assigned to an available bottom boarding position, Mr. Burkett did not consider that to be "light-duty" work. (Burkett Aff. at 11).

14. In his first affidavit, Mr. Taggart had said his original job was in final finish and that he was switched from that to bottom boarding. However, bottom boarding is part of the Final Finish Department. His clarification that he first worked as a molder in Final Finish clarifies that he did not leave the department, but was instead assigned a different job.

In fact, he describes it as "labor-intensive," a characterization Plaintiff does not dispute. Also, Mr. Burkett testified that even before Mr. Taggart's accident, Mr. Burkett had discussed with Mr. Mullins the possibility or reassigning Mr. Taggart to a different job when one became available, because Mr. Taggart was having performance problems as a molder. (Id. at ¶ 8). These facts, which Plaintiff does not explicitly dispute with either argument or evidence, further undermine Plaintiff's attempt to show pretext. Moreover, as was discussed in the context of Mr. Swain, even if this evidence could suggest Mr. Taggart was treated more favorably than Plaintiff, other evidence shows that this was a rare exception to a general rule.

Mr. Taggart's experience at Fleetwood could not persuade a reasonable jury that when Mr. Wagoner told Plaintiff that no other jobs were available and that her only option was a medical leave of absence, he was not acting pursuant to policy but was, instead, discriminating against her based on her pregnancy.

### c. *Donna Hyers*

Finally, Plaintiff points to Donna Hyers as another employee who was given light-duty work, even though she did not have an on-the-job injury. Plaintiff asserts that after Ms. Hyers underwent surgery, Defendant switched her from hanging curtains to cleaning houses. In response, Defendant argues that no reliable evidence suggests that Ms. Hyers received a light-duty assignment. Defendant also asserts that Ms. Michelle Rewis's testimony, on

which Plaintiff's arguments are based, is pure speculation. Defendant contends that Ms. Rewis had no personal knowledge of Ms. Hyer's medical restrictions or any requests by Ms. Hyers for light duty.[15]

The Court does not find that the evidence about Ms. Hyers is sufficient to create a question for a jury. The purported evidence is merely speculation by another employee who has no personal knowledge about why Ms. Hyers performed the tasks to which she was assigned. Plaintiff offers no evidence that Ms. Hyers returned to work with restrictions or that she even asked to be accommodated. Furthermore, Plaintiff has not explained why cleaning houses is a lighter duty assignment than hanging curtains. Moreover, Plaintiff has not discussed whether the cleaning position was open and available at the time Ms. Hyers was assigned to do it. A reasonable jury could not find from this evidence that Ms. Hyers was treated exceptionally. Therefore, Ms. Hyers' workplace experiences could not persuade a reasonable jury that Defendant's proffered explanation for refusing to reassign Plaintiff cannot be credited and is really pretext for pregnancy discrimination.

### 2. *Other alternatives*

In addition to asserting that other employees were accommodated, Plaintiff also asserts that the availability of alternatives to medical leave show that Defendant's reason for terminating her is mere pretext. For instance, Plaintiff argues that she could have been given help to do her own

---

15. Defendant also argues that Ms. Rewis testified that she knew about Defendant's light-duty policy, including the fact that she could not be given light-duty assignments for injuries that were not work-related. Defendant cites to page 14 of Ms. Rewis' deposition in support of that characterization. The Court

has carefully reviewed page 14 and finds that, while it shows that Ms. Rewis knew she had to get a note from her doctor authorizing her to work past her sixth month of pregnancy, it does not mention a light-duty policy, work-related injuries, or a medical leave of absence.

job. She contends that a foreperson had the power to reassign employees within the department. In response, Defendant argues that Plaintiff has mischaracterized the evidence.

As an initial matter, as the Court discussed in footnote 4, *supra,* Plaintiff has offered no evidence that other positions were available at the time she was given the lifting restrictions by her doctor. In fact, she admits that she knew of no available jobs wiping walls, puttying holes, or cleaning. Plus, Plaintiff admits that most of the jobs in Final Finish are labor-intensive, and also admits that some of the jobs would have exceeded her weight restrictions, such as the bottom boarding position which involved lifting a thirty-pound "creeper."

 Nevertheless, Plaintiff argues that she could have been given help to do her own job as an access panel installer. To support her claim that she could have been given assistance, Plaintiff may be relying on the fact that Mr. Burkett assigned two people to help her do her job while he and Mr. Wagoner investigated Plaintiff's options. In addition, Plaintiff claims that Ms. Hyers was given two employees to help her after her surgery.

The evidence is undisputed that a foreperson could reassign employees to different jobs on different days. As Mr. Wagoner testified, such moves were necessary for attendance and cross-training purposes. (Wagoner Depo. at 104). However, Mr. Wagoner did not say that a foreperson could move employees for extended periods of time. Although Plaintiff cites to Mr. Swain's deposition to support her arguments, Mr. Swain's testimony does not support a contrary finding. Mr. Swain testified only that supervisors "occasionally" switched people from job to job for about a week, such as when someone was on vacation or was out sick. (Swain Depo.

at 27). Mr. Swain stated that people were not permanently switched. (Id.) Accordingly, the fact that people were switched temporarily does not support a jury finding that Defendant could reassign employees indefinitely in Plaintiff's case.

Also undisputed is the fact that Plaintiff was assigned two employees to help her for a brief time before she was terminated. Mr. Burkett admits to having two employees help Plaintiff at first, but he claims that he did that to avoid having Plaintiff take any chances with her pregnancy until they could get her equipment weighed and see if she could perform her job functions. (Burkett Depo. at 32). This temporary move would not convince a reasonable jury that Defendant's decision not to have other employees assist Plaintiff for the length of her pregnancy is evidence of discrimination.

The purported evidence that is in dispute is whether Ms. Hyers was given assistance. Plaintiff asserts that according to the testimony of another employee, Ms. Hyers was given help as an accommodation, but Defendant argues that Plaintiff's evidence does not support this conclusory claim. As discussed earlier, the Court agrees that the deposition of Ms. Michelle Rewis does not create a material dispute about whether Defendant accommodated Ms. Hyers. For instance, Ms. Rewis does not know whether Ms. Hyers had restrictions imposed by her doctor or whether Ms. Hyers asked for light-duty work. In addition, Plaintiff has not explained how long Ms. Hyers had assistance, if she had assistance at all. Therefore, Ms. Rewis testimony about Ms. Hyers is insufficient to create a question for the jury.

Plaintiff has not offered sufficient evidence to show that Defendant's failure to reassign Plaintiff or reassign other employees to help Plaintiff is evidence of

pregnancy discrimination. Even assuming Defendant had some flexibility and asked employees to help each other on occasion, Plaintiff has introduced no evidence that Defendant reassigned employees for extended periods of time. Accordingly, Plaintiff has not explained why Defendant's failure to do so in this case shows it was discriminating because Plaintiff was pregnant.

### 3. *Conflicting explanations*

Another argument Plaintiff offers in order to show that Defendant's proffered reason is pretext is her claim that Defendant has been inconsistent about why Plaintiff was terminated. Plaintiff also claims that Mr. Wagoner told the Department of Labor that Plaintiff was terminated because she was pregnant. Defendant argues that the documents are not inconsistent, and that Plaintiff has misrepresented Mr. Wagoner's testimony.

In support of her contention that Defendant has been inconsistent about the reasons for Plaintiff's firing, Plaintiff cites to several documents, including a status change form documenting Plaintiff's termination, a separation notice completed by Defendant for the Georgia Department of Labor, and notes made by Defendant's employees. Looking at the contents of the different documents, the status change form states that Plaintiff was terminated because "no work available due to restriction given by doctor. MLOA was offered and refused." (Pla.Exh. E). The separation notice provides, "Associate could not perform her job duties due to her restrictions as documented by her physician on 10/26/98. We were unable to reasonably accomadate [sic] associates restrictions. Associate refused Medical leave. No alternative but to separate." (Pla.Exh. F). According to the notes made by one of Defendant's employees, Mr. Wagoner told

Plaintiff that they did not have a job that would meet her restrictions and that they "would not create a special job just for her." (Pla.Exh. G). Mr. Wagoner's own notes say that he told her that no jobs were available that suited her restrictions. (Pla. Exh. H at 2). He also told her that if a job came available or if her doctor allowed her to do her normal job, Plaintiff could return. (Id.) Both sets of notes state that Plaintiff was told she qualified for a six-month leave of absence. (Pla.Exhs.G, H).

Despite Plaintiff's statement to the contrary, the Court does not find that these documents can be deemed inconsistent. They show that Defendant did not have any available jobs that would fit Plaintiff's restrictions. They also show that Plaintiff was offered medical leave, which she denied. Plaintiff has not explained why these documents can be considered inconsistent either with each other or with Defendant's position throughout this case. Accordingly, these documents do not support Plaintiff's claim that Defendant's proffered reason for its actions in this case is merely pretext for pregnancy discrimination.

Plaintiff's assertion that Mr. Wagoner admitted telling the Georgia Department of Labor that Plaintiff was fired because she was pregnant also is insufficient to create a question for the jury. A review of the deposition testimony to which Plaintiff cites reveals that Plaintiff has mischaracterized Mr. Wagoner's statements. Mr. Wagoner said that he told the Department of Labor that "she became pregnant, and then, from that point on, I identified and received restrictions from her doctor, and that we didn't have any work available for her, any light-duty work available for her, under those restrictions." (Wagoner Depo. at 100). These statements are consistent with those con-

tained in the documents discussed above. No reasonable juror to find otherwise. Accordingly, Plaintiff has not demonstrated that an alleged inconsistency in Defendant's reasons precludes summary judgment in this case.

### 4. *Benefits*

Another recurring argument from Plaintiff is that Defendant discriminated against her because she was not eligible for medical leave or for benefits while on that leave. Defendant disputes that Plaintiff was not eligible for a medical leave of absence and asserts that pursuant to company policy, Plaintiff would have received disability pay and medical benefits while on leave.

As discussed in footnote 5, *supra,* Plaintiff has not shown that a material dispute of fact exists on the issue of whether she was entitled to a medical leave of absence with its accompanying benefits. Moreover, even if Plaintiff had offered evidence that she was not entitled to leave or benefits, or that she was misinformed about her eligibility, she has not explained why that would be evidence of pretext. In other words, she has not explained why her assertion that she was ineligible for benefits shows that she was terminated because of her pregnancy. For example, Plaintiff has not argued or offered evidence that employees who are not eligible for benefits are given light-duty work instead. Since an employer is not required to give special considerations to pregnant employees, Plaintiff has not shown that the issue of benefits would support a jury finding that Defendant was motivated by discrimination rather than company policy when Plaintiff was terminated.

### 5. *Summary*

The Court has considered every explicit and implicit argument from Plaintiff that purports to show that Defendant was not acting pursuant to a company light-duty policy, but was instead discriminating against Plaintiff when Defendant refused to accommodate her and eventually fired her. However, none of these arguments reveal such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's reason that a reasonable jury could believe Defendant was not motivated by its policy, but was instead discriminating against Plaintiff because she was pregnant. Clearly, Plaintiff wanted to keep working. Also clear is the fact that she believes Defendant could have accommodated her medical restrictions and made that possible. However, Title VII does not require Defendant to have done as Plaintiff hoped. Plaintiff was only entitled to the same treatment a non-pregnant employee would have received under the same circumstances.

At the summary judgment stage, a plaintiff must present to the Court any evidence and argument she would have for the jury. If she does not have sufficient evidence now, she will not have enough evidence to persuade a jury. Here, Plaintiff has not offered adequate evidence to show that Defendant's claim that it was following policy when Plaintiff was terminated cannot be believed. Consequently, summary judgment must be **GRANTED**.

### III. *Other causes of action*

Defendant argues that all Plaintiff's other claims, including her state law claims for damage to reputation and for intentional infliction of emotional distress, must be dismissed. In her response to Defendant's motion for summary judgment, Plaintiff admits that she cannot proceed on any of her other claims. Indeed, she confirms that she is only proceeding on her Title VII claim for pregnancy discrimination. Accordingly, the Court finds that all Plain-

1389

tiff's other claims are hereby DIS-MISSED.

IV. *Plaintiff's motion for summary judgment*

In her response brief, Plaintiff states that she is entitled to summary judgment. However, Plaintiff has never moved for summary judgment, she does not present the facts in the light most favorable to Defendant, and to support her request, Plaintiff does no more than revisit the same arguments already presented elsewhere in her brief. As a result, the Court doubts that Plaintiff actually meant to request summary judgment rather than urge the Court to deny Defendant's request. Even if she did, her motion would be denied.

## CONCLUSION

Plaintiff has failed to present a prima facie case of pregnancy discrimination, but even if she had done so, she cannot show that Defendant's proffered legitimate, non-discriminatory reason for its acts is pretext. Accordingly, Defendant's motion for summary judgment on Plaintiff's pregnancy discrimination claim is **GRANTED**. Since she concedes that she has no other viable claims, Plaintiff's case is **DISMISSED**.